OPINION OF THE COURT BY CHIEF JUSTICE MINTON
Under Kentucky's Unified Juvenile Code, a neglected child is one whose parent "[c]reates or allows to be created a risk of physical or emotional injury ... by other than accidental means"[1] or "[c]reates or allows to be created a risk that an act of sexual abuse, sexual exploitation, or prostitution will be committed upon the child...."[2] Deciding whether a child is a neglected child under the Code is a judicial function, requiring proof by a preponderance of the evidence. And, when we review these trial court determinations on appeal, *540 we do so for abuse of discretion, affording these decisions a high degree of insulation from appellate revision because, in addition to the written record, the trial court has experienced the proceedings directly and observed the litigants first-hand.[3]
We granted discretionary review to consider whether the trial court abused its discretion when it found the two children in the present case to be neglected children under the Code and in its dispositional order required in-home supervision by their mother of all contact with them by their father, who has a history of criminal convictions for sexually abusing his underage half-brother and a failure to comply with conditions of probation. Upon our review of the record, we hold that the trial court did not abuse its discretion. We reverse the contrary decision of the Court of Appeals and reinstate the trial court's order.
I. BACKGROUND.
In 2003, as an eighteen-year-old high school student, Robert[4] performed oral sex upon and received oral sex from his twelve-year-old half-brother. Again, in 2006, Robert engaged in the same abusive behavior with the same half-brother. At the time of the second act of sexual abuse, the two were twenty-one and fifteen-years-old.
In February 2007, Robert pleaded guilty to third-degree sodomy for the 2006 act of sexual abuse. He was sentenced to two years in prison, with the entire sentence probated for three years. As a condition of his probation, Robert was ordered to complete the Sex Offender Treatment Program (SOTP) and was prohibited from living in the same household as minor children.[5]
In March 2007, Robert pleaded guilty to first-degree sexual abuse stemming from the 2003 act of sexual abuse. He was sentenced to one-year imprisonment, probated on the conditions that he live outside Clark County, Kentucky, have no contact with his victim, have no unsupervised contact with minors, and that he complete SOTP.[6]
Because of Robert's convictions for two sex crimes against a minor victim, he is required to register as a sex offender for the remainder of his life.[7]
As required by the conditions of his probation, Robert entered SOTP in June 2007. But he was terminated from the program in August 2009 after allowing a family with two minor sons to live with him for a week and a half in violation of his *541 probation. He admitted to this violation and served 27 days in jail as a result.
Robert re-entered SOTP in March 2010 but was discharged from the program in April 2011. His discharge summary indicates that Robert was "[u]nable to complete all phases of treatment due to [the] [e]xpiration of [his] sentence." The summary specifies "[g]iven that [Robert]'s probation sentence expired on April 2, 2011, he is being discharged from the SOTP effective April 19, 2011." Although Robert did not complete the program, he did complete "the autobiography, ownership, a basic relapse prevention plan, and portions of the sexuality and victim awareness modules." The discharge summary notes that Robert "put forth some effort at improving" during the program "by processing his issues ... in group." The discharge summary also notes that Robert, while in the SOTP, had been grouped with special-needs individuals because of his literacy and maturity deficits. Finally, the discharge summary notes that Robert's "primary risk factors appear to involve his emotional immaturity, passivity, esteem deficits, and isolation."
Robert's discharge summary contained three conditions: (1) have no contact with children unless approved by his probation or parole officer; (2) not reside with children without the permission of probation or parole; and (3) submit to a polygraph examination. The discharge summary indicated that Robert scored in the low-moderate category for re-offending based on the "Static 99" risk assessment.
In June 2011, Robert pleaded guilty to failing to register as a sex offender.
Robert met Alice in 2011 and told her of his criminal record early in their relationship. The two married in 2012 and had their first son that year. Robert and Alice had their second son in 2015.
While Alice was pregnant with the couple's younger son, the Cabinet for Health and Family Services (CHFS) opened an investigation into Robert and Alice's family and eventually filed in the family division of the circuit court a dependency, neglect, or abuse (DNA) petition regarding the parents' older son and a second petition regarding their younger son a month later. The first DNA action alleged the older son was "at risk of harm" due to Robert's "past history of sexual offenses and placement on the sex offender registry." The second DNA action alleged the younger son was "at risk of harm" because Robert "resides in the home and is a registered sex offender." CHFS's case history in its DNA dispositional report indicates that "CHFS became involved with the family on 1-12-15 when a report was received that a registered sex offender was living in the home with his 2-year-old son and that he was unsupervised with the child placing the child at risk of harm."
At all points during the CHFS investigation and DNA action, Robert and Alice complied with CHFS's recommendations. CHFS recommended that Robert submit to a sex-offender risk assessment, and the trial court ordered that he do so. CHFS provided Robert with a list of providers to conduct the assessment, and he chose Dr. Connor. Dr. Connor wrote a report based on his psychological and psychosexual evaluation of Robert. And the trial court considered his report in making its findings in the case.
In Dr. Connor's report, he first described the battery of tests, the results of which he considered in determining Robert's risk to reoffend.[8] After discussing *542 Robert's history at length,[9] Dr. Connor's report explained the psychometric test results and evaluated the risk for sexual re-offense.
Dr. Connor noted that Robert scored favorably on the "Parenting Awareness Skills Survey" and the "Parenting Stress Inventory." Dr. Connor also administered the "Child Abuse Potential Inventory," where he found the following:
[T]he Child Abuse Potential Inventory ... is an instrument utilized to determine if a person has character traits typically found in those who are abusive toward children. On this instrument, [Robert] responded in a slightly guarded manner thus compromising the reliability and validity of the test results. [Robert] seems to have some difficulty acknowledging minor faults that he may have that others typically acknowledge. When his degree of guardedness is taken into consideration, it does not completely invalidate his profile. [Robert] does not appear to have overt character traits consistent with those who are abusive toward children based on the results of this instrument.
Dr. Connor also administered the "Millon Clinical Multiaxial Inventory-III" test, which, according to his report, "is a psychometric based psychological assessment that identifies various severe psychiatric disorders as well as personality disorders." Dr. Connor noted that "[Robert] does not trust others and thus tends to withhold his emotions and thoughts for fear of being emotionally harmed." Dr. Connor also noted, "Over time, his pent-up emotions can predispose him to interpersonal and social withdrawal. Interpersonally, this can make him somewhat difficult to deal with over time." Finally, Dr. Connor noted, "[Robert's] tendency to isolate and withdraw exacerbates his interpersonal challenges."[10] Dr. Connor concluded, "however, there are no indications of severe psychopathology or character pathology that would warrant concern or further consideration at this time." We must note, however, that Dr. Connor, in the "Sexual Development" section earlier in his opinion, acknowledged that Robert stated that he "learned through [SOTP]" that the " 'trigger' to his offense [committed against his half-brother] ... was primarily loneliness, feeling left out from his peer group, and sexual curiosity."[11]
Dr. Connor next discussed Robert's results upon taking the "Abel Assessment for sexual interest-3, which is a Visual Reaction Time assessment combined with his extensive sexual history questionnaire." Important to note are Dr. Connor's findings that "there are no indications that [Robert] has an interest in any of the paraphilias" and that "[t]here are no indications *543 that [Robert] has any type of sexual interest in age inappropriate children, especially male children within the age range of his biological children."
Dr. Connor discussed Robert's results from the STATIC 99R, "a risk assessment guideline that has identified ... variables ... that are predictive of a sexual re-offense." Dr. Connor used the assessment Robert was given upon his discharge from SOTP in April 2011 in coming to his conclusion that Robert was at low risk to reoffend. In the 2011 assessment, Robert was rated as low/moderate risk for reoffending. Since Robert had gone five years without any reoffending known to Dr. Connor, he concluded that Robert fell into the low-risk category.[12] Dr. Connor conducted the Sexual Violence Risk-20 assessment on Robert and concluded that under this test he was also in the low-risk category to commit another sexual offense in the future. Dr. Connor further determined Robert was at a low risk to reoffend based on the short version of the Hare Psychopathy Checklist.
Based on his psychometric testing, Dr. Connor opined that Robert did not raise any "red flags" for reoffending but noted that "he does tend to be somewhat guarded and defensive at times." Dr. Connor went on to state, "[i]n conclusion, it is my firm clinical opinion that [Robert] is at 'Low Risk' to sexually reoffend, especially his biological children." Finally, Dr. Connor opined that Robert "meet[s] the criteria for a Persistent Depressive Disorder," which he attributed to the cumulative trauma Robert suffered from of the experiences connected to his two convictions for sex-abuse crimes. Dr. Connor opined that Robert "would certainly benefit from brief individual psychotherapy to address persistent symptoms and an interpersonal level of mistrust which negatively impacts his everyday life."
Finally, it appears that Dr. Connor's opinions and conclusions "are based solely on [Robert's] rendition of events, as well as the psychometric test results and surveys." Earlier in the report, Dr. Connor identified that the "Joint Stipulations document was reviewed," as well.[13]
Throughout the CHFS investigation, the trial court adopted CHFS's recommendation that Robert have supervised contact with his sons, with whom he and Alice shared a home. As noted, following Robert's sex-offender assessment, neither CHFS nor the trial court recommended he undergo any further remedial steps to have unsupervised contact with his sons. In its dispositional report, CHFS acknowledged that Robert's sex-offender risk assessment "did not recommend any further treatment and he was rated as low risk to reoffend." The CHFS report went on to opine, however, that this low-risk rating was due to the fact his previous victim was an adolescent and that the risk to the children would increase as they matured.
CHFS further indicated "[t]he parents have been cooperative with CHFS since the onset of the case." CHFS indicated *544 that "the family has completed the services that would be recommended at Disposition" apart from Alice's completion of a seminar, which she subsequently completed. CHFS had also recommended that Alice attend sex-offender classes with Robert if he were required to repeat them. Because Robert was not required to repeat the classes, this recommendation was never implemented. CHFS's recommendations to the trial court were that "[d]espite completing services [Robert] still places the children at risk of harm and CHFS would continue recommending only supervised contact." Earlier in the report, CHFS had indicated that this risk of harm was due to the children "living in the home with a sex offender."
It appears that CHFS never recommended third-party supervision in this home; rather, CHFS simply recommended the following:
Despite completing services[,] [Robert] still places the children at risk of harm and CHFS would continue recommending only supervised contact. CHFS would look at closing this case but keep supervision orders in place regarding [Robert] and contact with his children. 1. [Robert] will have only supervised contact with the children and must always remain within sight and sound of the supervisor. 2. CHFS would continue to have concerns about the [Alice's] ability to supervise all contact at night when sleeping but CHFS recognizes that it is unrealistic to order that the [she] sleep in the same room with the children indefinitely. CHFS would recommend that [Alice] use her best judgment in safe supervision of the children and report any concerns of safety to CHFS.
Following the adjudication hearing in the DNA action, the trial court found "[b]ased on prior history and even favorable, albeit inconsistent, evaluation that still labels Father at 'low (some) risk' the Court finds children to be at risk of harm." Based on that finding, the trial court concluded that Robert and Alice had neglected their children by creating or allowing to be created a risk of injury or sexual abuse.
Robert and Alice filed a motion to alter, amend, or vacate, arguing that "[t]he court utilized the best possible finding for [Robert] [ (a finding of low risk to re-offend) ] into a finding of risk of harm to the children ..." and attached a letter from Dr. Connor indicating that low risk is the most favorable rating one can achieve on the assessments because there is not a classification for "no risk." Robert and Alice also argued that the trial court's conclusion would be tantamount to a determination that "a prior sexual conviction equals neglect."
The original trial judge retired, and the special judge assigned to the case denied the parents' motion to vacate, amend, or alter the trial court's order. In his denial, the special judge considered Robert's criminal convictions and violations of probation, in addition to the "tender age" of Robert's biological children. The special judge took issue with Dr. Connor's opinion that Robert is at low risk to reoffend, finding inconsistencies within the report. Specifically, the special judge noted that Dr. Connor's report was inconsistent as to the number of times Robert had sexually abused his half-brother-and that, based upon these inconsistencies, he was "unable to determine which facts Dr. Connor [sic] used to reach his final conclusion." More importantly, the special judge found:
[T]hat the children in this case are in danger of abuse as the father has shown on at least two occasions that he will not follow the guidelines as he violated his probation by living with minors and failed to follow the registry requirements of a sex offender.
*545 Furthermore, the Court cannot ignore that the sex crimes committed by the father were against his blood relative.
A third trial judge held a disposition hearing in the case following the denial of the parents' motion to alter, amend, or vacate. That judge deemed all CHFS's recommendations appropriate and adopted them in full. Specifically, the judge noted that Alice, not any third party, was required to supervise Robert's contact with the children.
Robert and Alice appealed to the Court of Appeals, which reversed and remanded to the trial court to deny CHFS's petitions and dismiss the action. Specifically, the Court of Appeals took issue with the trial courts' handling of the case, believing that the trial court took shortcuts and did not fully comply with KRS 620.100(2), which outlines the procedure to be used in a DNA action. Additionally, the Court of Appeals did not believe CHFS proved its case by a preponderance of the evidence, apparently assuming the trial court only relied on the 25 joint stipulations of fact the parties agreed to. Finally, the Court of Appeals believed that this case stood for the proposition that "a finding of neglect cannot be sustained solely on a child living with a biological parent who is a registered sex offender."
We granted CHFS's motion for discretionary review.
II. ANALYSIS .
At the outset, we must note that the Court of Appeals, the parties to this case, and amicus frame the issue in this case to be: Whether a registered sex offender may ever raise his children without government oversight, or-stated more dramatically-whether sex-offender-registrant status, in and of itself, is sufficient for a finding of neglect or abuse. But these are not the issues before this Court. These fundamental headline-grabbing issues have misdirected the appeals of this case.
This Court must determine the propriety of the trial court's order finding neglect and ordering in-home supervision of the situation by Alice whenever Robert interacts with his boys. In other words, the issue before us is whether the trial court abused its discretion in determining that Robert-a man with two separate felony convictions for sexual abuse of an underage male family member and a history of failing to comply with conditions of sex-offender probation-should not be left alone with his underage male children, particularly considering a psychological evaluation, having some inconsistencies, rendering him at "low risk" of reoffending. Under the circumstances of this case, we cannot say the trial court abused its discretion in so finding, especially when the responsibility of ensuring the children, who have been left in the home at all times, are not alone with Robert has been placed in Alice's hands.
The family court found in two disposition orders under KRS 600.020(1)(a)(2) and (6) that Robert and Alice neglected their two children. A finding of neglect under these statutes results when the court is satisfied, by a preponderance of the evidence,[14] that the individual "[c]reates or allows to be created a risk of physical or emotional injury ... by other than accidental means"[15] or "[c]reates or allows to be created a risk that an act of sexual *546 abuse, sexual exploitation, or prostitution will be committed upon the child...."[16]
"The trial court has a great deal of discretion in determining whether the child fits within the abused or neglected category...."[17] The best articulation of the standard of review to be applied by the appellate court comes from the Court of Appeals' decision in L.D. v. J.H. :
This Court's standard of review ... in a dependency, abuse and neglect action is limited to whether the factual findings of the lower court are clearly erroneous. Whether or not the findings are clearly erroneous depends on whether there is substantial evidence in the record to support them. If the findings are supported by substantial evidence, then appellate review is limited to whether the facts support the legal conclusions made by the finder of fact. The legal conclusions are reviewed de novo. If the factual findings are not clearly erroneous and the legal conclusions are correct, the only remaining question on appeal is whether the trial court abused its discretion in applying the law to the facts. Finally, "[s]ince the family court is in the best position to evaluate the testimony and to weigh the evidence, an appellate court should not substitute its own opinion for that of the family court. If the findings of fact are supported by substantial evidence and if the correct law is applied, a family court's ultimate decision ... will not be disturbed absent an abuse of discretion "[18]
"The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[19]
Here, the trial court did not need to conduct any real fact-finding because the parties jointly stipulated to all the facts, Dr. Connor's report was the only expert testimony provided in this case, and no other fact was disputed. And no one has argued to us that the "correct law" was not applied in this case. But Robert contends the trial court misapplied the applicable law. All that remains is "whether the trial court abused its discretion in applying the law to the facts" in finding neglect.[20]
Robert is a twice-convicted sex offender, having committed two separate acts of sexual abuse three years apart on an underage male family member. In 2009, Robert was terminated from the Sex Offender Treatment Program for having allowed a family with two minor sons to live with him for a week and a half, which was in violation of the terms of probation he received from his convictions. Two years after he was terminated from the SOTP, Robert pleaded guilty to failing to register as a sex offender. Today, Robert resides with Alice and their two young male children, ages six and three.
Robert underwent two psychosexual assessments relevant to this case. The first was in 2011, when the evaluator concluded him to be at low to moderate risk for reoffending. The second was Dr. Connor's evaluation, which appeared to the trial court to have some confusing inconsistencies.
*547 Dr. Connor found Robert to be at low risk for reoffending, especially as it relates to his biological children.
CHFS criticizes Dr. Connor's report, which the Court of Appeals identified as "being based largely on father's self-reporting, containing multiple internal contradictions, and lack of a current 'Static 99' risk assessment-Dr. Connor simply adopted the 2011 results and assumed father was still low risk' because he had incurred no new changes since the first assessment." The trial court did note what it believed to be inconsistencies with Dr. Connor's report: 1) under the "Criminal History" section of the report, no mention was made of Robert's second felony offense; 2) in one section, the statement is made that Robert stated that he did not drink alcohol "during his adolescent years," but later admits to having drunk as a 16-year-old; and 3) that Robert strictly identifies himself a heterosexual when he had two sexual encounters with a male.
The trial court based its decisions on "prior history and [an] even favorable, albeit inconsistent, evaluation that still labels Robert at 'low (some) risk.' " All three judges who handled this case at the trial court level had the joint stipulations, Dr. Connor's report, and statements made at evidentiary hearings before them to assist in making their determinations. In other words, all three trial judges had before them all the information we have identified above. And all three trial judges came to the same conclusion.
Under the circumstances of this case, we cannot say that the trial court abused its discretion in finding that Robert and Alice neglected their two sons, specifically, because they "[c]reate[d] or allow[ed] to be created a risk of physical or emotional injury ... by other than accidental means"[21] or "[c]reate[d] or allow[ed] to be created a risk that an act of sexual abuse, sexual exploitation, or prostitution will be committed upon the child...."[22] by allowing Robert to be alone with his two underage male children. We are particularly reluctant to find an abuse of discretion here when the only remedial action stemming from that finding is the trial court's dispositional order that Robert should not be left alone with the children and Alice should act as monitor.
Sex-offender-registrant status does not always automatically equate to a finding of neglect under KRS 600.020. Importantly, the trial court has not announced such a rule here, and this case has never been about that issue. Considering Robert's convictions for sexually abusing an underage male family member, his subsequent probation violations, the previous psychological report characterizing Robert at low-to-moderate risk of reoffending, the entirety of Dr. Connor's slightly inconsistent report, and the fact that Robert remains classified as a risk, albeit low, to reoffend, we are unwilling to say the trial court's dispositional order reflects a ruling that was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[23]
Taking Dr. Connor's statement as true, that "low risk" is the lowest level classification of risk to reoffend, even Dr. Connor would necessarily have to admit that Robert "[c]reates or allows to be created a risk of physical or emotional injury ... by other than accidental means"[24] or "[c]reates or allows to be created a risk that an act of *548 sexual abuse, sexual exploitation, or prostitution will be committed upon the child...."[25] KRS 600.020(1)(a)(2) does not calibrate for the judiciary the tolerable degree of risk when considering a potential finding of neglect. It is a matter for judicial discretion. If psychosexual assessment standards do not contain a category of "no risk" in evaluating an offender's chances for reoffending, then a risk for reoffending, in the eyes of the treatment professionals, necessarily exists. And that risk of reoffending surely must be taken into account considering the offender's initial offenses and subsequent history. While it is unknown to us whether Robert's chances of reoffending are victim-specific, we cannot conclude that the trial court abused its discretion in finding that Robert and Alice's children were at risk, considering Robert's prior criminal acts, committed against an underage family member, and his inability to complete probation supervision successfully.
The Court of Appeals and Robert believe that CHFS did not prove its case by a preponderance of the evidence. But in so arguing, the Court of Appeals and Robert continue to frame the issue in this case as the trial court's having found neglect simply because he was a registered sex offender. Considering all that we have mentioned, which the trial court did, and which includes far more than simply Robert's status as a registered sex offender, we find that CHFS did prove its case by a preponderance of the evidence.
The Court of Appeals and Robert cite cases from other jurisdictions for the proposition that "Courts have made clear that a parent's status as a sex offender does not constitute per se child neglect or otherwise create a presumption of child neglect."[26] The Court of Appeals and Robert heavily rely on In re AftonC .[27] In that very same decision, however, New York's highest Court recognized the same case-by-case determination of this issue that we recognize today:
No doubt there are circumstances in which the facts underlying a sex offense are sufficient to prove neglect. Where, for example, sex offenders are convicted of abusing young relatives or other children in their care, their crimes may be evidence enough. Our conclusion here might also be different if respondent had refused sex offender treatment after being directed to participate in it, or if other evidence showed that such treatment was necessary.[28]
Apart from recognizing a conviction for a sex crime stemming from sexual abuse of a young relative, the exact kind of conviction we are dealing with in Robert's situation, could be enough for a finding of neglect or abuse, the Afton C. Court made clear that matters like the one before us today must be evaluated on a case-by-case basis. We refuse to establish a bright-line rule in these kinds of cases and shall evaluate them individually.
Because we cannot find an abuse of discretion on the part of the three family court judges who participated in this case in real time, found neglect to exist, and ordered that Alice supervise Robert's interaction with his two sons, we reverse the *549 Court of Appeals and reinstate the orders of the family court.
III. CONCLUSION.
Because we cannot say from the record before us that the trial court abused its discretion, we reverse the Court of Appeals and reinstate the orders of the trial court.
All sitting. Minton, C.J.; Hughes, Keller, and VanMeter, JJ., concur. Wright, J. concurs by separate opinion in which Venters, J., joins. Cunningham, J., dissents by separate opinion.

Kentucky Revised Statute (KRS) 600.020(1)(a)(2).

KRS 600.020(1)(a)(2).

See Henry J. Friendly, Indiscretion About Discretion, 31 Emory L.J. 747, 783 (1982) ("In those situations 'where the decision depends on first-hand observation or direct contact with the litigation,' the trial court's decision 'merits a high degree of insulation from appellate review.' ") (internal citations omitted).

To protect the privacy of this family, we use pseudonyms. The father we call "Robert" and the mother we call "Alice." They are husband and wife and the biological parents of the two male children.

As explained further below in this opinion, Dr. Connor, a licensed clinical psychologist, performed a psychological evaluation of Robert. In his written opinion, under the "Mental Health History" section, Dr. Connor reports that Robert "received anger management counseling ... at about the same time he attended [SOTP.]"

It appears that an additional condition of Robert's probation was to refrain from drinking alcohol. Robert admitted to Dr. Connor, a fact which is confirmed by the SOTP discharge summary, that Robert did consume alcohol "on two occasions since entering treatment."

See KRS 17.520(2)(a)(4).

These procedures included: The Clinical Interview, Mental Status Exam, the Sexual Development Interview, the Background Conduct Survey, the Drug and Alcohol Screening, the Child Abuse Potential Inventory, the Test of General Reasoning Ability, the Millon Clinical Multiaxial Inventory-IV, the Abel Assessment for sexual interest-3, and the Multidimensional Inventory of Development, Sex, and Aggression.

Under the "Criminal History" section of his report, Dr. Connor stated, "The only offense [Robert] reports is the sex offense when he was 18 years old." We cannot determine whether Robert was intentionally withholding reporting the offense he committed at age 21, or if this is meant to indicate something else. This is one of several inconsistencies to which CHFS points to question Dr. Connor's opinion and Robert's lack of candor. Another one of these inconsistencies is that in one part of the report, Robert denies having used alcohol "during his adolescent years," but then later admits to having drunk alcohol at age 16. Finally, the trial court noted during an evidentiary hearing that Robert identifies as "strictly heterosexual," yet had two sexual encounters with a person of the same sex.

(emphasis added).

(emphasis added).

It is unclear whether Dr. Connor performed his own STATIC 99R test or whether he simply believed that he could now rate Father at "low risk" for reoffending because Robert had previously been rated at "low/moderate risk" and nothing about Robert indicated a propensity to reoffend in Dr. Connor's opinion.

We also note that Alice was psychologically evaluated, as well, but not by Dr. Connor. The evaluator reported favorable results for Alice. The evaluator did recommend that she "[a]ttend Sexual Offender classes with her husband" and "[p]articipate in 2-3 psychoeducational sessions with a certified Sexual Offender counselor focusing on warning signs of sexual abuse in children [and] safety techniques for families with children."

See KRS 620.100 ("The burden of proof shall be upon the complainant, and a determination of dependency, neglect, and abuse shall be made by a preponderance of the evidence.").

KRS 600.020(1)(a)(2).

Id.

M.P.S. v. Cabinet for Human Resources, 979 S.W.2d 114, 116 (Ky. App. 1998) (citing Department for Human Resources v. Moore, 552 S.W.2d 672, 675 (Ky. 1977) ).

350 S.W.3d 828, 829-30 (Ky. App. 2011) (internal citations omitted) (emphasis added).

Goodyear Tire and Rubber Co. v. Thompson, 11 S.W.3d 575, 581 (Ky. 2000) (citing Commonwealth v. English, 993 S.W.2d 941, 945 (Ky. 1999) ).

L.D. v. J.H., 350 S.W.3d at 830 (emphasis added).

KRS 600.020(1)(a)(2).

Id.

Goodyear Tire, 11 S.W.3d at 581 (citing English, 993 S.W.2d at 945 ).

KRS 600.020(1)(a)(2) (emphasis added).

Id.

As an aside, this is yet another indication of the improper assumption made in this case that the trial court based the entirety of its rulings simply on Robert's status as a lifetime sex offender registrant.

17 N.Y.3d 1, 926 N.Y.S.2d 365, 950 N.E.2d 101 (2011).

Id. 926 N.Y.S.2d 365, 950 N.E.2d at 106 (emphasis added).