MODIFIED: OCTOBER 2, 2019
RENDERED: AUGUST 29, 2019
TO BE PUBLISHED



# Supreme Court of Kentucky

2019-SC-000020-DGE

CABINET FOR HEALTH AND FAMILY                                    APPELLANTS
SERVICES, COMMONWEALTH OF
KENTUCKY; AND K.L.W.W., A CHILD

ON REVIEW FROM COURT OF APPEALS
V.           CASE NO. 2018-CA-000012-MR
FAYETTE CIRCUIT COURT NO. 17-AD-00146

P.W.                                                            APPELLEE

AND

2019-SC-000021-DGE

CABINET FOR HEALTH AND FAMILY                                    APPELLANTS
SERVICES, COMMONWEALTH OF
KENTUCKY; AND K.N.W.W., A CHILD

ON REVIEW FROM COURT OF APPEALS
V.           CASE NO. 2018-CA-000015-MR
FAYETTE CIRCUIT COURT NO. 17-AD-00147

P.W.                                                            APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**REVERSING AND REMANDING**

The Fayette County Family Court terminated P.W.[1] and K.W.'s parental rights to K.N.W.W. and K.L.W.W. Both P.W. and K.W. appealed to the Court of Appeals. The Court of Appeals affirmed the trial court's termination of K.W.'s parental rights[2] but reversed P.W.'s termination of parental rights, holding that sufficient evidence did not support the trial court's finding that P.W. neglected the children. The Cabinet for Health and Family Services (Cabinet) petitioned this Court for discretionary review, which we granted. After our review of the record and the law, we reverse the Court of Appeals and remand to the Court of Appeals to determine whether sufficient evidence supported the trial court's finding that the remaining requirements of Kentucky Revised Statute (KRS) 625.090 were met.

**I. BACKGROUND**

P.W. was born in Ghana, Africa. She came to the United States in 2007 when she was fourteen years old. K.W. was born in Indiana and grew up in California. P.W. and K.W. were married in 2013. During their marriage, P.W. and K.W. had three children. Two of those children, K.N.W.W. and K.L.W.W., are the subjects of this appeal.

---

[1] Due to the confidential nature of termination of parental rights actions in family court, the parties will be identified by initials.

[2] K.W.'s case is not presently before this Court.

K.N.W.W. was born on September 26, 2013. In April of 2014, the Cabinet received a report that P.W. was seen crying on the side of the road, after being kicked out of a car being driven by K.W. Concerned with possible domestic violence, Mara Clay, an investigative worker for the Cabinet, visited the home of P.W. and K.W. Clay was forced to return with law enforcement, at which point she observed a dark marking on K.N.W.W.'s bottom. She requested that the mark be evaluated by the child's pediatrician. The pediatrician, while unable to give specific information to Clay over the phone, assured her that he did not have any concerns about the child's wellbeing. Despite this, Clay told P.W. and K.W. to bring the child to the University of Kentucky (U.K.) Hospital. At U.K. Hospital, a doctor confirmed that the spot on K.N.W.W. was a Mongolian spot and not a bruise, however K.W. began acting erratically. He was very paranoid and aggravated. He accused the examining doctor of sexually touching K.N.W.W. Therefore, the physician placed K.N.W.W. on a medical hold and would not release him to K.W. and P.W. Both K.W. and P.W. became very upset and had to be escorted off the property by security.

Based on these events and resulting concerns about domestic violence in the home, mental health issues, and low cognitive functioning, the Cabinet filed for and was granted emergency custody of K.N.W.W. on April 3, 2014. A temporary removal hearing was held on April 7, 2014, and K.N.W.W. was placed in the Cabinet's custody. Both parents signed and began working case plans the following week. On December 4, 2014, both parents stipulated to

3

dependency of K.N.W.W. New case plans were developed and the family continued to work with the Cabinet.

On May 16, 2015, while K.N.W.W. was still in the custody of the Cabinet, K.L.W.W. was born to P.W. and K.W. Hospital staff reported concerns to the Cabinet regarding P.W.'s constant breastfeeding of K.L.W.W. Sara Reis, investigative worker for the Cabinet, met with the family at the hospital. P.W. became hysterical and could not finish the interview. Based on continuing concerns about mental health issues, low cognitive functioning, and domestic violence, the Cabinet requested and received emergency custody of K.L.W.W. on May 19, 2015. He was placed in the same foster home as K.N.W.W. On June 30, 2015, the family court made a finding of dependency against both parents. The family continued to work with the Cabinet.

In January of 2016, K.W. and P.W. began having unsupervised visitation with the children. In February of 2016, they began having unsupervised overnight visits with the children. Unsupervised visits were gradually increased until the children were returned to their parents' home in November of 2016.

About 10 days after the children returned home, their pediatrician reported to the Cabinet that K.N.W.W. came into his office without a shirt in cold weather and with an upset stomach. He made the referral to the Cabinet because P.W. and K.W. could not answer questions from the medical staff.

On December 19, 2016, the Cabinet received another report that K.N.W.W arrived at daycare with a red mark on his face. He told daycare workers that K.W. had slapped him. K.W. denied slapping K.N.W.W. and stated

4

he had no knowledge of the injury. P.W. told the Cabinet worker that she hadn't noticed the mark on K.N.W.W.'s face before she left him with K.W. that morning. K.W. and P.W. refused to sign a prevention plan but agreed to take K.N.W.W. to U.K. Hospital. The Cabinet worker was concerned about the safety of the children if left in the care of K.W. and about P.W.'s ability to protect them in the home with K.W. Therefore, both children were returned to their previous foster home that night.

Less than two weeks later, K.W. assaulted P.W. P.W. notified police and sought and obtained an emergency protective order, and then a domestic violence order, against K.W. for her and the children. K.W. eventually pled guilty in criminal cases to two counts of assault in the fourth degree – one count for slapping K.N.W.W. and the other count for assaulting P.W. He also stipulated in family court to abuse of both K.N.W.W. and K.L.W.W. P.W. signed a new case plan that included complying with the domestic violence order against K.W. However, P.W. did not believe that K.W. had slapped K.N.W.W. until after she was told K.W. had pled guilty to the criminal charge of assault. She further stated that she didn't know that slapping was domestic violence despite participating in therapy, parenting classes, and domestic violence classes over the previous two years.

Over the next two years, P.W. continued to work with the Cabinet and work on her various case plans. Despite this work, the ongoing Cabinet worker continued to have concerns about P.W.'s ability to safely parent her three children on her own. Also during this time period, Dr. David Feinberg, a

5

licensed clinical psychologist, completed an evaluation of the family.[3] This was Dr. Feinberg's fourth family evaluation with the first occurring in November 2014 and the last occurring in May 2017. Dr. Feinberg's first three evaluations all recommended that the Cabinet continue to provide services to the family with the ultimate goal of reunification. In his final evaluation, however, he opined that P.W. lacked insight into domestic violence, took no responsibility for the removal of her children, and could not apply the skills she learned to life. Dr. Feinberg believed that she could not parent the children on her own due to her limited stress management skills and that there were no additional services the Cabinet could provide to assist in reunification.

On November 26, 2018, the Cabinet filed petitions to terminate the parental rights of K.W. and P.W. to both K.N.W.W. and K.L.W.W. After a three-day bench trial, the trial court terminated the parental rights of both parents to both children, entering findings of fact and conclusions of law on December 6, 2017. Both parents appealed the trial court's order to the Court of Appeals. The Court of Appeals affirmed K.W.'s termination of parental rights but reversed P.W.'s termination of parental rights, holding that sufficient evidence did not support the trial court's finding that P.W. neglected the children. This Court granted the Cabinet's request for discretionary review of the portion of the Court of Appeals opinion reversing the trial court's termination of P.W.'s parental rights. We now reverse that portion of the Court of Appeals' opinion.

---

[3] Dr. Feinberg's testimony was not made a part of the record on appeal, so we rely on the detailed rendition of his testimony included in the trial court order.

6

## II. ANALYSIS

"In order to protect the rights of natural parents, Kentucky courts require strict compliance with statutory provisions governing the involuntary termination of parental rights." *P.C.C. v. C.M.C., Jr.*, 297 S.W.3d 590, 592 (Ky. App. 2009) (citing *Day v. Day*, 937 S.W.2d 717 (Ky. 1997)). Kentucky's statutory provision regarding termination of parental rights is found in KRS 625.090,[4] which requires that the trial court find by clear and convincing evidence that a three-prong test has been satisfied. First, the trial court must find that the child at issue is an abused or neglected child as defined in KRS 600.020(1).[5] Next, the trial court must find that termination of parental rights

---

[4] KRS 625.090 has been amended since this case was tried in the trial court. In this opinion we will refer to the statutory provisions in effect at the time of the trial.

[5] "(1) The Circuit Court may involuntarily terminate all parental rights of a parent of a named child, if the Circuit Court finds from the pleadings and by clear and convincing evidence that:
(a) 1. The child has been adjudged to be an abused or neglected child, as defined in KRS 600.020(1), by a court of competent jurisdiction;
2. The child is found to be an abused or neglected child, as defined in KRS 600.020(1), by the Circuit Court in this proceeding;
3. The child is found to have been diagnosed with neonatal abstinence syndrome at the time of birth, unless his or her birth mother:
a. Was prescribed and properly using medication for a legitimate medical condition as directed by a health care practitioner that may have led to the neonatal abstinence syndrome; or
b. Is currently, or within ninety (90) days after the birth, enrolled in and maintaining substantial compliance with both a substance abuse treatment or recovery program and a regimen of prenatal care or postnatal care as recommended by her health care practitioner throughout the remaining term of her pregnancy or the appropriate time after her pregnancy; or
4. The parent has been convicted of a criminal charge relating to the physical or sexual abuse or neglect of any child and that physical or sexual abuse, neglect, or emotional injury to the child named in the present termination action is likely to occur if the parental rights are not terminated." KRS 625.090(1)(a).

7

is in the best interest of the child.[6] Finally, the trial court must find that one of

the enumerated statutory grounds for termination exists.[7] The Court of Appeals

---

[6] "(1) The Circuit Court may involuntarily terminate all parental rights of a parent of a named child, if the Circuit Court finds from the pleadings and by clear and convincing evidence that... (c) Termination would be in the best interest of the child." KRS 625.090(1)(c).

[7] "No termination of parental rights shall be ordered unless the Circuit Court also finds by clear and convincing evidence the existence of one (1) or more of the following grounds:

(a) That the parent has abandoned the child for a period of not less than ninety (90) days;

(b) That the parent has inflicted or allowed to be inflicted upon the child, by other than accidental means, serious physical injury;

(c) That the parent has continuously or repeatedly inflicted or allowed to be inflicted upon the child, by other than accidental means, physical injury or emotional harm;

(d) That the parent has been convicted of a felony that involved the infliction of serious physical injury to any child;

(e) That the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child and that there is no reasonable expectation of improvement in parental care and protection, considering the age of the child;

(f) That the parent has caused or allowed the child to be sexually abused or exploited;

(g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child;

(h) That:

1. The parent's parental rights to another child have been involuntarily terminated;

2. The child named in the present termination action was born subsequent to or during the pendency of the previous termination; and

3. The conditions or factors which were the basis for the previous termination finding have not been corrected;

(i) That the parent has been convicted in a criminal proceeding of having caused or contributed to the death of another child as a result of physical or sexual abuse or neglect; or

(j) That the child has been in foster care under the responsibility of the cabinet for fifteen (15) cumulative months out of forty-eight (48) months preceding the filing of the petition to terminate parental rights." KRS 625.090(2).

8

opinion in this case only addressed the first prong of the test, and thus we will do the same. The Court of Appeals reversed the trial court by holding that "for a person to abuse or neglect a child, she must intend to do so," and finding that sufficient evidence was not presented to the trial court to support a finding that P.W. intended to abuse or neglect her children. In making this holding, the Court of Appeals cites to two authorities – its own previous opinion in *K.S. v. Commonwealth*,[8] in which this Court has granted discretionary review, and the *Kentucky Practice Series*, authored by Louise Everett Graham and James E. Keller.[9] To resolve the question of whether intent is required for a finding of abuse or neglect, we must review the relevant statutes and this Court's previous precedent.

**A. Under the plain language of KRS 600.020(1) and relevant case law, one need not intend to abuse or neglect a child for that child to be adjudged an "abused or neglected child."**

This case first presents us with the task of interpreting KRS 600.020(1). Statutory interpretation is an issue of law which we review *de novo*. *Cumberland Valley Contractors, Inc. v. Bell County Coal Corp.*, 238 S.W.3d 644, 647 (Ky. 2007) (citing *Bob Hook Chevrolet Isuzu, Inc. v. Commonwealth, Transp. Cabinet*, 983 S.W.2d 488, 490 (Ky. 1998)).

> In construing statutes, our goal, of course, is to give effect to the intent of the General Assembly. We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration. We presume that the General Assembly

---

[8] No. 2018-CA-000088-ME, 2018 WL 3945299, at *4 (Ky App. Aug. 17, 2018).

[9] 15 KY PRACTICE SERIES, DOMESTIC RELATIONS LAW § 6:9 (2017).

intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes.

*Shawnee Telecom Resources, Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky. 2011) (internal citations omitted).

(1) "Abused or neglected child" means a child whose health or welfare is harmed or threatened with harm when:
　　(a) His or her parent, guardian, person in a position of authority or special trust, as defined in KRS 532.045, or other person exercising custodial control or supervision of the child:
　　　　1. Inflicts or allows to be inflicted upon the child physical or emotional injury as defined in this section by other than accidental means;
　　　　2. Creates or allows to be created a risk of physical or emotional injury as defined in this section to the child by other than accidental means;
　　　　3. Engages in a pattern of conduct that renders the parent incapable of caring for the immediate and ongoing needs of the child including, but not limited to, parental incapacity due to alcohol and other drug abuse as defined in KRS 222.005;
　　　　4. Continuously or repeatedly fails or refuses to provide essential parental care and protection for the child, considering the age of the child;
　　　　5. Commits or allows to be committed an act of sexual abuse, sexual exploitation, or prostitution upon the child;
　　　　6. Creates or allows to be created a risk that an act of sexual abuse, sexual exploitation, or prostitution will be committed upon the child;
　　　　7. Abandons or exploits the child;
　　　　8. Does not provide the child with adequate care, supervision, food, clothing, shelter, and education or medical care necessary for the child's well-being. A parent or other person exercising custodial control or supervision of the child legitimately practicing the person's religious beliefs shall not be considered a negligent parent solely because of failure to provide specified medical treatment for a child for that reason alone. This exception shall not preclude a court from ordering necessary medical services for a child;
　　　　9. Fails to make sufficient progress toward identified goals as set forth in the court-approved case plan to allow for the safe return of the child to the parent that results in the child remaining committed to the cabinet and remaining in foster

care for fifteen (15) of the most recent twenty-two (22) months;[10] or

(b) A person twenty-one (21) years of age or older commits or allows to be committed an act of sexual abuse, sexual exploitation, or prostitution upon a child less than sixteen (16) years of age.

KRS 600.020(1).

The Court of Appeals held that "for a parent to abuse or neglect a child, she must intend to do so." We disagree. We find nothing in the plain language of the statute or in our precedent requiring a trial court to find that a parent intentionally abused or neglected her child.

At the outset, we must call attention to the fact that P.W. conflates an intentional act with an intentional result. P.W. points to the definition of "dependent child" found in KRS 600.020(20), taken in context with the definition of "abused or neglected child," to argue that an intentional act is required by a parent for a child to be abused or neglected. Under KRS 600.020(20), a dependent child is defined as "any child, *other than an abused or neglected child*, who is under improper care, custody, control, or guardianship *that is not due to an intentional act* of the parent, guardian, or person exercising custodial control or supervision of the child." (Emphasis added). She argues that because a dependent child is one who is, by definition, not an abused or neglected child, and because a dependent child is "under the improper care...that is not due to an intentional act," it necessarily follows that

---

[10] This subsection has since been amended to include a timeframe of "fifteen (15) cumulative months out of forty-eight (48) months."

an abused or neglected child must be such because of an intentional act of the parent. Accordingly, she argues, the Court of Appeals reached the correct conclusion. This is flawed logic, however, as the absence of a requirement of an intentional act in one definition does not necessarily create that requirement in another definition.

Further, the Court of Appeals did not require an intentional *act* in its holding. It held that "for a parent to abuse or neglect a child, she must intend to do so." This is requiring an intentional *result* – that the parent intend that the result of their actions be that the child is abused or neglected. We are explicitly overruling that holding today.

In *Cabinet for Health & Family Servs. on behalf of C.R. v. C.B.*, this Court held that risk of harm, without any actual harm, was enough for a finding of abuse or neglect. 556 S.W.3d 568, 576 (Ky. 2018). In that case, the father's drug use was found to have created a risk of harm to his child. *Id.* While a person's use of drugs is an intentional act, it does not necessarily follow that he intended to abuse or neglect his child when he used drugs, as the Court of Appeals would require. Yet, we still found that the father in C.B. abused or neglected his child by creating a risk of harm by using drugs.

In *Cabinet for Health & Family Servs. v. R.S.*, this Court affirmed the trial court's finding of abuse or neglect against both mother and father when father was a registered sex offender and mother allowed him to be alone with their two underage male children. 570 S.W.3d 538, 547 (Ky. 2018). This finding was based on the facts underlying father's sex offense convictions, his failure to

complete the Sex Offender Treatment Program, his violation of probation, his conviction for failing to register as a sex offender, and a psychological report classifying him as having a low-to-moderate risk to reoffend. *Id.* at 546-47. In no way did this Court require a finding by the trial court that mother *or* father *intended* to abuse or neglect their children. The facts of *R.S.* make it clear that a parent is not required to intend to abuse or neglect their child for the trial court to make a finding that the child is, in fact, abused or neglected.

These cases support the common-sense conclusion that while in some cases an intentional act leads to a finding of abuse or neglect, there is no requirement that the parent actually intend to abuse or neglect the child.

Finally, the Court of Appeals cited to Graham and Keller's *Kentucky Practice Series* which states, "A child who suffers harm as a result of a parent's intentional acts is neglected or abused. In contrast, a child is dependent if the harm results from a parent's unintentional acts, or from a cause unrelated to parental culpability." 15 KY PRACTICE SERIES, DOMESTIC RELATIONS LAW § 6:9 (2017). Here, the Court Appeals, like P.W., conflates an intentional act with an intentional result. The Court of Appeals' holding only refers to an intentional result, but this quote discusses an intentional act. Further, had the Court of Appeals continued reviewing Graham and Keller, they would have eventually reached the section entitled "Involuntary termination of parental rights – Findings of neglect or abuse." 16 KY PRACTICE SERIES, DOMESTIC RELATIONS LAW § 25:20 (2017). This section makes clear that intentional acts by the parent are not required when it states, "The statutory definitions of abuse and neglect do

13

not require wilfull [sic] action by a parent." *Id.* (citing KRS 600.020(1)'s definition of abuse or neglect that includes cases where a parent "allows" another person to inflict physical or emotion injury on a child).

For all of these reasons, we hold that a parent need not intend to abuse or neglect a child in order for that child to be adjudged an abused or neglected child. We now move to the question of whether substantial evidence supported the trial court's finding of neglect in P.W.'s termination of parental rights proceeding.

## B. Substantial evidence supported the lower court's finding of neglect in the termination of parental rights proceeding.

A trial court has broad discretion in its determination of whether a child is dependent, neglected, or abused. *Dep't for Human Res. v. Moore*, 552 S.W.2d 672, 675 (Ky. App. 1977). A "trial court's findings regarding the weight and credibility of the evidence shall not be set aside unless clearly erroneous." Kentucky Rule of Civil Procedure (CR) 52.01. "Under this standard, an appellate court is obligated to give a great deal of deference to the trial court's findings and should not interfere with those findings unless the record is devoid of substantial evidence to support them." *D.G.R. v. Commonwealth, Cabinet for Health & Family Servs.*, 364 S.W.3d 106, 113 (Ky. 2012) (citations omitted). Substantial evidence has been defined as some evidence of substance and relevant consequence, having the fitness to induce conviction in the minds of reasonable people. *Smyzer v. B.F. Goodrich Chem. Co.*, 474 S.W.2d 367, 369 (Ky. 1971). Further, "the trial court, as the finder of fact, has the responsibility

to judge the credibility of all testimony, and may choose to believe or disbelieve any part of the evidence presented to it." *K.R.L. v. P.A.C.*, 210 S.W.3d 183, 187 (Ky. App. 2006) (citing *Caudill v. Maloney's Discount Stores*, 560 S.W.2d 15, 16 (Ky. 1977)).

Based on our review of the evidence, the family court's factual findings are supported by the record and its finding that P.W. neglected K.N.W.W. and K.L.W.W. was sound.

### 1. K.N.W.W.

The trial court found K.N.W.W. to be an abused or neglected child under KRS 600.020(1)(a)(1)-(4) and (9). The trial court made findings of fact to support its conclusions under each subsection.

KRS 600.020(1)(a)(1) states, "'Abused or neglected child' means a child whose health or welfare is harmed or threatened with harm when...[h]is or her parent...[i]nflicts or allows to be inflicted upon the child physical or emotional injury as defined in this section by other than accidental means." The trial court found that K.W. struck K.N.W.W. It also found that P.W. knew K.W.'s history of violence and failed to take any action to protect K.N.W.W. from K.W. The trial court found that P.W. could have prevented K.N.W.W.'s injury if she had been honest with the Cabinet about the domestic violence that was occurring in the home. While it may be difficult to definitively say that P.W. "could have prevented [K.N.W.W.]'s injury," substantial evidence supported the trial court's finding that P.W. allowed physical injury to be inflicted upon K.N.W.W. by K.W.

15

KRS 600.020(1)(a)(2) states, "'Abused or neglected child' means a child whose health or welfare is harmed or threatened with harm when...[h]is or her parent...[c]reates or allows to be created a risk of physical or emotional injury as defined in this section to the child by other than accidental means." To support its conclusion that K.N.W.W. was an abused or neglected child under this subsection, the trial court found that K.N.W.W. was initially removed from the home after P.W. was left on the side of the road, crying, claiming she had been hit and kicked. The Cabinet repeatedly voiced concern about domestic violence occurring in the home. P.W. refused to admit any domestic violence until after K.W. slapped K.N.W.W. and attacked her, injuring both. The trial court further found that despite participating in three years of psychoeducation, therapy, and other services provided by the Cabinet, P.W. still stated that she did not know she was a victim of domestic violence. The trial court found that P.W. did nothing to protect her children because she did not disclose K.W.'s aggression to any service provider. The trial court then found that P.W.'s failure to act to protect the children created a risk of physical or emotional injury by other than accidental means. The record shows substantial evidence supported this conclusion. In addition to the above evidence, testimony was presented at the trial court that P.W. arrived to a supervised visit with the children with a black eye, but stated that it was caused by a food allergy. Further, despite not calling it "domestic violence," P.W. reported a history of physical altercations with K.W., including one

incident which occurred before the children were born that required her to seek medical attention.

KRS 600.020(1)(a)(3) states, "'Abused or neglected child' means a child whose health or welfare is harmed or threatened with harm when...[h]is or her parent...[e]ngages in a pattern of conduct that renders the parent incapable of caring for the immediate and ongoing needs of the child including, but not limited to, parental incapacity due to alcohol and other drug abuse as defined in KRS 222.005." In addition to the findings listed in our discussion of subsection 2, the trial court also found that P.W. "engaged in a pattern of conduct incompatible with safe parenting." The trial court found that P.W. was unable or refused to seek services to address the domestic violence in the home, despite being provided with multiple service providers, and this refusal led to K.N.W.W. being injured while in her home. The trial court found that P.W.'s "pattern of being unable to identify and protect her children from dangerous situations renders her unable to meet the basic ongoing needs of her children." Substantial evidence was presented to the trial court to support this finding.

KRS 600.020(1)(a)(4) states, "'Abused or neglected child' means a child whose health or welfare is harmed or threatened with harm when...[h]is or her parent... [c]ontinuously or repeatedly fails or refuses to provide essential parental care and protection for the child, considering the age of the child." The trial court made many of the same factual findings to support its conclusion under this subsection as it did for the subsections discussed above. We find

17

that the record shows substantial evidence supported the trial court's determination that K.N.W.W. was an abused or neglected child under subsection four.

KRS 600.020(1)(a)(9) states:

> "Abused or neglected child" means a child whose health or welfare is harmed or threatened with harm when...[h]is or her parent... [f]ails to make sufficient progress toward identified goals as set forth in the court-approved case plan to allow for the safe return of the child to the parent that results in the child remaining committed to the cabinet and remaining in foster care for fifteen (15) of the most recent twenty-two (22) months.[11]

In concluding that K.N.W.W. was an abused or neglected child under this subsection, the trial court acknowledged that P.W. "attended almost every class or therapy session, attended almost every visitation available, and complied with almost every request of the Cabinet." However, the trial court went on to find that despite this compliance, P.W. and K.W. were unable to maintain stability in the home, resulting in injuries to both K.N.W.W. and P.W. The trial court found that P.W. was unable to apply any of the skills she learned and, that as a result of this, K.N.W.W. had remained committed to the Cabinet for the requisite period of time. In reviewing some of the multiple case plans associated with this case, we observe objectives such as "Family will improve safety of child through improved parenting and self understanding"; "[P.W.] will utilize plan to ensure a safe living environment free from domestic violence";

---

[11] This subsection has since been amended to include a timeframe of "fifteen (15) cumulative months out of forty-eight (48) months."

18

"Family will ensure a safe living environment free from domestic violence & unaddressed mental health concerns that impacts one's ability to meet daily living tasks, needs, and development of infant to promote a safe, nurturing, and stable environment"; and "[P.W.] will utilize plan to address concerns of inability to retain information, demonstrate appropriate parenting, nurturing, and attachment & bonding, and continue to address identified mental health needs to prevent neglect." It is clear from these very specific objectives and the fact that domestic violence was continuing in the home that P.W. did not make sufficient progress towards these goals, and substantial evidence supported the trial court's finding under subsection nine. This Court does, however, take this opportunity to express concern regarding the appropriateness of the tasks included on a case plan if a parent can complete every task but still not reach the stated objective.

### 2. K.L.W.W.

The trial court found K.L.W.W. to be an abused or neglected child under KRS 600.020(1)(a)(2)-(4) and (9). The trial court made the same findings of fact to support its conclusions under each subsection as it did regarding K.N.W.W. While no evidence was offered that K.L.W.W. was subjected to physical abuse, the evidence that K.N.W.W. was physically abused provided sufficient evidence that there was a risk K.L.W.W. would also be harmed. As we stated in *Cabinet v. C.B.*, evidence of risk of harm is sufficient to support a trial court's finding of neglect. 556 S.W.3d at 576. Therefore, we find that substantial evidence

19

supported the trial court's determination that K.L.W.W. was an abused or neglected child.

## III. CONCLUSION

For the foregoing reasons, we reverse the Court of Appeals and remand to the Court of Appeals to determine whether sufficient evidence supported the trial court's finding that the remaining requirements of KRS 625.090 were met.

All sitting. All concur.

COUNSEL FOR APPELLANT, CABINET FOR HEALTH AND FAMILY SERVICES, COMMONWEALTH OF KENTUCKY:

Tiffany Lorraine Yahr
Cabinet for Health and Family Services


COUNSEL FOR APPELLANTS, K.L.W.W., A CHILD, AND K.N.W.W., A CHILD:

Nicole Dyonne Carr


COUNSEL FOR APPELLEE, P.W.:

Jennifer McVay Martin
McVay Martin Shepard, PSC

# Supreme Court of Kentucky

## 2019-SC-000020-DGE

CABINET FOR HEALTH AND FAMILY SERVICES,                    APPELLANTS
COMMONWEALTH OF KENTUCKY; AND
K.L.W.W., A CHILD


ON REVIEW FROM COURT OF APPEALS

V.                 CASE NUMBER 2018-CA-000012-MR
FAYETTE CIRCUIT COURT NO. 17-AD-00146


P.W.                                                          APPELLEE

AND

## 2019-SC-000021-DGE


CABINET FOR HEALTH AND FAMILY SERVICES,                    APPELLANTS
COMMONWEALTH OF KENTUCKY; AND
K.N.W.W., A CHILD


ON REVIEW FROM COURT OF APPEALS

V.                 CASE NUMBER 2018-CA-000015-MR
FAYETTE CIRCUIT COURT NO. 17-AD-00147


P.W.                                                          APPELLEE

## O R D E R

Appellant's motion entered September 4, 2019 to reconsider publication of this Court's Memorandum Opinion rendered August 29, 2019, is hereby granted. The attached modified Opinion of the Court is hereby substituted in lieu of the Memorandum Opinion rendered August 29, 2019 and does not affect the holding of the original Memorandum Opinion.

All sitting. All concur.

ENTERED: October _2_, 201$

_____

CHIEF JUSTICE

2