**Boyd KIMBLER, Appellant,**

v.

**Tammie ARMS, Larry Gray, East Kentucky Water Conditioner and Earnest Taulbee, Appellees.**

No. 2002–CA–000289–MR.

Court of Appeals of Kentucky.

March 14, 2003.

---

13. *Supra,* n. 8.

14. This case arose prior to Lexington's merger with Fayette County.

15. *City of Lexington, supra,* n. 8, at 254.

16. *Id.* at 259.

Robert G. Miller, Jr., Perry, Preston & Miller, Paintsville, KY, for appellant.

Ned Pillersdorf, Pillersdorf, DeRossett & Lane, Prestonsburg, KY, for appellee Tammie Arms.

Before HUDDLESTON, PAISLEY and TACKETT, Judges.

## OPINION

HUDDLESTON, Judge.

Alleging that Johnson Circuit Court misapplied Kentucky Revised Statutes (KRS) 411.137 [1] and KRS 391.033 [2] in determining that he "willfully abandoned" his son, Boyd Kimbler appeals from the court's opinion and order finding that he is disqualified from receiving his statutory share of the wrongful death settlement proceeds recovered by his son's mother, Tammie Arms. Kimbler also appeals from a subsequent order denying his motion to alter, amend or vacate the court's original order in which it clarified that "the nonpayment of child support, while relevant and material under the applicable legal principles," was not the controlling factor in its decision.

The present dispute stems from the tragic and untimely death of nine-year-old Justin Arms, the biological son of Arms and Kimbler, who died on September 27, 1997, from an injury he sustained when an automobile driven by Larry Gray [3] struck the bicycle he was riding. On March 23, 1998, Arms was appointed administratrix of Justin's estate with Kimbler waiving notice of a hearing on the appointment.[4] A few months later, Arms initiated a wrongful death action against Gray and unnamed defendants alleging that Gray had operated his motor vehicle in a "reckless, careless, and/or negligent" manner on the day of the accident and that the fatal collision was a "direct and proximate result" of this "reckless, careless, and/or negligent act." Arms and Gray entered

---

1. Ky.Rev.Stat. (KRS) 411.137 provides as follows:

 (1) A parent who has willfully abandoned the care and maintenance of his or her child shall not have a right to maintain a wrongful death action for that child and shall not have a right otherwise to recover for the wrongful death of that child, unless:

 (a) The abandoning parent had resumed the care and maintenance at least one (1) year prior to the death of the child and had continued the care and maintenance until the child's death; or

 (b) The parent had been deprived of the custody of his or her child under an order of a court of competent jurisdiction and the parent had substantially complied with all orders of the court requiring contribution to the support of the child.

 (2) This section may be cited as Mandy Jo's Law.

2. KRS 391.033 provides as follows:

 (1) A parent who has willfully abandoned the care and maintenance of his or her child shall not have a right to intestate succession in any part of the estate and shall not have a right to administer the estate of the child, unless:

 (a) The abandoning parent had resumed the care and maintenance at least one (1)

year prior to the death of the child and had continued the care and maintenance until the child's death; or

 (b) The parent had been deprived of the custody of his or her child under an order of a court of competent jurisdiction and the parent had substantially complied with all orders of the court requiring contribution to the support of the child.

 (2) Any part of a decedent child's estate prevented from passing to a parent, under the provisions of subsection(1) of this section, shall pass through intestate succession as if that parent has failed to survive the decedent child.

 (3) This section may be cited as Mandy Jo's Law.

3. According to the complaint filed by Arms, Gray was "the servant, employee, and/or agent of the Defendant, UNKNOWN DEFENDANTS LISTED AS EAST KENTUCKY WATER CONDITIONER–ERNEST TAULBEE, . . ."

4. Arms is named in both this capacity and individually in the complaint in the wrongful death action which includes a claim for loss of companionship.

into negotiations and ultimately settled the case for the sum of $46,250.00. Shortly thereafter, Arms filed a motion pursuant to Mandy Jo's Law [5] seeking to disqualify Kimbler from receiving his statutory share of the recovery due to his alleged abandonment of Justin.

On September 21, 2001, the circuit court conducted an evidentiary hearing on the matter at which six witnesses testified, including Kimbler and Arms. In an order entered on December 5, 2001, the court made the following findings of fact:

1. The Plaintiff, Tammie Arms, and Boyd Kimbler are the biological parents of Justin Arms who died at the age of nine on September 27, 1997, arising out of an automobile collision.

2. During the month Justin Arms died, Boyd Kimbler was in arrearages on his monthly child support obligation of $60.00 per month in the approximate sum of $3,200.00, which can be calculated to being approximately four and one-half years in arrearages.

3. During Justin's life, Tammie Arms was in sole custody of the child with visitation rights given to Boyd Kimbler. The evidence given by Mr. Kimbler with regards to his presence at these visits and his residence during the applicable time period is false and misleading and as such is given minimal weight by this Court.

4. During Justin's life, Mr. Boyd Kimbler did not participate in the child's educational upbringing. When questioned as to Justin's last teacher and Justin's last grade level, Mr. Kimbler could not give a definitive answer and was wrong in his ultimate response.

5. Mr. Kimbler did not attend Justin's funeral, nor did he contribute to the burial or funeral expenses.

6. Under the wrongful death statute, the surviving parents are entitled to a one-half share of any wrongful death proceeds, subject to the remedial statute better known as Mandy Jo's Law.

7. The Plaintiff, Tammie Arms, filed such a wrongful death action and sought compensation for her consortium claim and testified as to loss of companionship as the result of Justin's death.

8. Mr. Boyd Kimbler did not file such a consortium claim, nor did he participate in the instant action.

9. In the instant action, a settlement was negotiated and was agreed upon on August 10, 2001. The amount of the settlement was $46,250.00.

10. Following the settlement, notice was given to Boyd Kimbler by the Plaintiff seeking to disqualify him from any recovery pursuant to the aforementioned Mandy Jo's Law.

11. A hearing was held on the matter, on September 21, 2001, in which both sides solicited testimony and other evidence in support of their positions.

12. The Court finds that an actual and justiciable controversy exists that warrants declaratory judgment.

After correctly observing that Mandy Jo's Law has not yet been interpreted in a published Kentucky decision, the circuit court examined comparable statutes and related case law from sister jurisdictions before adopting the definition of abandonment utilized by North Carolina. In so doing, the court found the North Carolina definition to be the "most reasonable" because its statute is "substantially similar, if not identical, to Kentucky's Mandy Jo's Law and further[,] because the North Carolina definition of abandonment seems to coincide with the majority view on the

5. KRS 411.137, *supra*, n. 1; KRS 391.033, *supra*, n. 2.

issue, ..." [6] Both parties had "paid particular attention to the natural father's obligation for child support and its effect on the proceedings." However, the court emphasized its agreement with the majority position viewing non-support as only one of the factors to consider when determining whether a parent abandoned his child, specifically clarifying that Alabama's "stance on failure to support, *i.e.*, being of paramount or manifest, if not controlling, importance, is a minority position."

Having reviewed the evidence of record in light of the employed definition of abandonment, the court determined that Kimbler "did not support his child in any respect" and "came peri[l]ously close to being held in contempt of court for perjury when describing the frequency and validity of his visitation with Justin." Because Kimbler "willfully neglected to lend support and maintenance, withheld his presence, his care, and his opportunities to display filial affection from Justin," the court concluded that Kimbler "willfully abandoned his child under the meaning of the statute and therefore forfeited his right to share [in the wrongful death recovery.]" [7] Kimbler appeals from this determination and the court's subsequent

denial of his motion to alter, amend or vacate its order.

On appeal, Kimbler argues that the circuit court improperly applied the North Carolina definition of abandonment as opposed to the Kentucky definition and, further, "failed to apply the plain meaning" of abandonment in determining that he abandoned Justin. Kimbler further argues that he did not abandon Justin under any definition of the term and that the court "made certain [factual] findings that were not supported by the evidence" and erred in "emphasizing certain findings" to conclude that he "willfully abandoned" his son. In Arms's view, Kimbler "clearly fits any definition of an abandoning parent" and the court properly exercised its discretion in assessing the credibility of the witnesses and weighing the evidence in its entirety before finding that Kimbler abandoned Justin.

 Since this case was tried before the court without a jury, its "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." [8] A factual finding is not clearly erroneous if it

---

**6.** N.C. Gen.Stat. § 31A–2(1) and (2) contain language verbatim to that contained in KRS 391.033(1) in every significant respect. According to the circuit court, North Carolina case law interpreting these provisions defines abandonment as follows:

> Any wil[l]ful or intentional conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. Wil[l]ful intent is an integral part of abandonment and this is a question of fact to be determined from the evidence.
> * * *
> Abandonment has also been defined as wil[l]ful neglect and refusal to perform the natural and legal obligations of parental care and support. It has been held that if a parent withholds his presence, his love, his

care, the opportunity to display filial affection, and wil[l]fully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child. (Citations omitted).

**7.** As observed by the court:

> ... Mr. Kimbler's family, particularly his mother, did not in fact abandon Justin. The evidence elicited by Mr. Kimbler all clearly evidenced Justin's grandmother's love, affection, and nurturing of Justin. However, at issue in this case is not the family unit as a whole, nor whether or not Justin's grandmother abandoned him or was otherwise a bad grandmother, which she was not.

**8.** Ky. R. Civ. P. (CR) 52.01.

is supported by substantial evidence, that is, "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men."[9] However, as a reviewing court, we are not bound by the trial court's decision on questions of law. "An appellate court reviews the application of the law to the facts and the appropriate legal standard *de novo.*"[10] Consistent with these principles, then, our function is to answer the strictly legal question of what constitutes abandonment for the purpose of applying Mandy Jo's Law and, further, to apply that definition to the current facts in order to determine whether Kimbler abandoned Justin, an inquiry which necessarily requires ascertaining whether substantial evidence exists to support the findings of the circuit court.

■ In *Hafley v. McCubbins,*[11] cited by Kimbler, this Court defined abandonment in the context of an appeal from a judgment which awarded the proceeds of a servicemen's group life insurance policy to the stepparents of a child decedent rather than the natural mother. At issue was whether the mother had abandoned her child, thereby precluding her from recovering the subject proceeds.[12] Because the concept of abandonment had previously been construed only in the criminal realm, we sought "an acceptable criteria for civil matters involving recovery of damages or benefits by a parent as opposed to a custodial nonparent where it is alleged that the natural parent has 'abandoned' the offspring."[13]

Although the United States Code was of no assistance and the only relevant annotation revealed no single accepted definition of the term abandon, the element of support was "universally held to be a significant factor."[14] In reviewing the jurisprudence of our sister states, we learned that many elements had been considered when making this determination, including "a course of conduct suggesting a conscious disregard or indifference of parental obligations," and "having a child in the care of others on a permanent or indefinite basis," as well as the "resumption or nonresumption" of parental obligations.[15]

However, we deemed the definition derived from the interpretation of a New York statute which paralleled the federal provision to be the most persuasive. In construing the term "abandon" for purposes of applying its statute, a New York court held that it meant "neglect and refusal to perform natural and legal obligations to care and support, withholding of parental care, presence, opportunity to display voluntary affection and neglect to lend support and maintenance."[16] Abandon was further interpreted to mean "the

9. *Owens–Corning Fiberglas Corp. v. Golightly,* Ky., 976 S.W.2d 409, 414 (1998) (citations omitted).

10. *Carroll v. Meredith,* Ky.App., 59 S.W.3d 484, 489 (2001).

11. Ky.App., 590 S.W.2d 892, 894 (1979).

12. *Id.* at 892. Pursuant to 38 United States Code (U.S.C.) § 765, *et seq.,* the decedent's life was covered by Servicemen's Group Life Insurance which, in turn, was issued by Prudential Insurance Company of America. Prudential filed an interpleader action which re-

sulted in the parties being in contention for the funds. *Id.* at 893.

38 U.S.C. § 765(9) provides that "[n]o person who abandoned or willfully failed to support a child during his minority, or consented to his adoption may be recognized as a parent for the purpose of this subchapter." *Id.*

13. *Id.* at 894.

14. *Id.*

15. *Id.* (citation omitted).

16. *Id.* (citation omitted).

failure to fulfill responsibility of care, training and guidance during the child's formative years." [17] Implicitly adopting this approach, we ultimately found "the receipt of benefits whether for wrongful death or from a contract of life insurance to be so closely akin" that the aforementioned principles were applicable to both.[18] Having previously defined the term abandon in the context of a wrongful death action, we now adopt this definition of abandon(ment) in relation to Mandy Jo's Law as a logical extension of this dispositive reasoning.

Further support for this conclusion is found in *J.H. v. Cabinet for Human Resources*,[19] in which we were confronted with the question of whether incarceration constitutes abandonment sufficient to warrant the termination of parental rights, evidence of which must be strictly scrutinized. We concluded that "incarceration alone can never be construed as abandonment as a matter of law[,]" but "absence, voluntary or court-imposed, may be a factor to consider" in determining whether a child has been neglected.[20] In so doing, we said that "[g]enerally, abandonment is demonstrated by facts or circumstances that evince a settled purpose to forego all parental duties and relinquish all parental claims to the child." [21] Consistent with this premise, we also reaffirmed the validity of the definition of abandonment provided in *Hafley*, implicitly extending its application to termination cases.[22] As the critical language of the authority relied upon by the circuit court in defining aban-

donment mirrors that adopted here, the analysis remains unchanged. Accordingly, the inquiry becomes whether substantial evidence exists to support the factual findings upon which the circuit court based its determination that Kimbler abandoned Justin.

■ By his own admission, Kimbler was at least four years behind in his child support obligation at the time of Justin's death which equated to approximately $3,000.00 in arrearages.[23] Kimbler emphasizes the fact that he began paying child support in 1990 pursuant to court order, made a $120.00 payment three months prior to Justin's death, a $60.00 payment the month he died and has continued making payments since that time, also pursuant to court order. Not surprisingly, however, the court found this evidence unpersuasive, an assessment which is not only permissible, but imminently reasonable given Kimbler's admitted delinquency which this evidence merely highlights rather than excuses.

Contrary to Kimbler's contention, the circuit court explicitly rejected the minority position as to the weight that should be given to this factor and reiterated this position, which is consistent with the definition of abandonment adopted by this Court, in its order denying Kimbler's motion to alter, amend or vacate. Although nonsupport is not decisive, it has uniformly been deemed one of the relevant factors for consideration as established by the preceding summary. Kimbler does not dis-

**17.** *Id.* (citation omitted).

**18.** *Id.*

**19.** Ky.App., 704 S.W.2d 661 (1986).

**20.** *Id.* at 663.

**21.** *Id.* at 663, *quoting O.S. v. C. F.*, Ky.App., 655 S.W.2d 32, 34 (1983).

**22.** *Id.*

**23.** Kimbler was obligated to pay $60.00 per month in child support. According to his testimony, the payment was lowered to $40.00 per month in 1999.

pute this assertion, but instead takes issue with the court's evaluation of the evidence, a task uniquely within its province. Because the circuit court properly weighed the undisputed evidence as to the amount and duration of Kimbler's child support arrearages along with the other evidence in making its determination, Kimbler's argument in this vein must fail.

Equally without merit is Kimbler's argument regarding his level of involvement in Justin's life as he again misunderstands the role of the court in reviewing the evidence presented. Kimbler acknowledges the court's skepticism as to his testimony with respect to the frequency and quality of his visitation with Justin. In his view, however, the court erred in its determination since he offered the testimony of other witnesses to substantiate his account of events, "there was no evidence to contradict" his testimony and the "scant testimony" on this subject offered by Arms "falls short of supporting" the court's decision.

In addition to the testimony of Arms and Kimbler, the court heard testimony from Kimbler's sister, aunt, uncle and mother, all of which, to varying degrees, verified that of Kimbler.[24] Nonetheless, the court found the testimony of Arms[25] more credible when viewed in light of the evidence in its entirety; the resolution of such factual disputes is precisely the func-

tion of the circuit court. As the circuit court was in the best position to judge the veracity of the witnesses, we must give "due regard" to its assessment of their testimony. Having done so, we cannot say that its determination was clearly erroneous. Arms's testimony standing alone constitutes substantial evidence upon which the circuit court could have based its finding as to Kimbler's visitation with Justin, but no single factor was determinative as evidenced by the court's order. To the contrary, the circuit court carefully weighed the evidence as a whole before concluding that Kimbler abandoned Justin with Kimbler's perceived lack of credibility undermining his position.

With respect to Justin's education, we disagree with Kimbler's assertion that the court's finding is conclusively refuted by the evidence and, further, that his lack of participation, "even if supported by the evidence, should not be an element of abandonment under the present circumstances." No credible argument can be made that education is not among the fundamental areas encompassed in the "natural and legal obligations" of parenting. The court's determination that Kimbler's inability to recall even the most basic information on this subject was indicative of his lack of participation in Justin's edu-

---

**24.** Upon being asked how often he saw his son, Kimbler replied: "I seen him every weekend just about, maybe six or seven times out of the year on weekends we didn't have him." Kimbler further testified that he lived in proximity to Justin throughout his life and that Justin was frequently exposed to his extended family since they also lived nearby. According to Kimbler, he called "about twice a week to check on [Justin]" and Justin spent "every summer, every spring break, every summer break, [and] all the holidays except Halloween" with his family.

**25.** In relevant part, Arms testified as follows:

Q: Did anybody exercise visitation rights with your son, let's say in the last two years of his life?
A: Yes.
Q: Who was that?
A: His mother.
* * *
Q: Did you ever go pick up your son after visitation?
A: Yes.
Q: Did he indicate to you whether or not he would ever see his father?
A: He said he didn't.
Q: When you went to pick him up did you ever see Mr. Kimbler?
A: No.

cation seems particularly justified when viewed in context. Conflicting evidence on this issue does not render the court's finding clearly erroneous and, again, Kimbler's lack of awareness as to this critical aspect of Justin's development was not the sole factor relied upon by the court in making its determination but was a contributing factor in its analysis, an approach that is both consistent with and mandated by the relevant authority.

To summarize, for the purposes of applying Mandy Jo's Law, abandon means "neglect and refusal to perform natural and legal obligations to care and support, withholding of parental care, presence, opportunity to display voluntary affection and neglect to lend support and maintenance … It means also the failure to fulfill responsibility of care, training and guidance during the child's formative years." [26] Further, as correctly observed by the circuit court, the differing factual situations that are likely to appear in this context make a bright line rule impossible, and, as such, analysis under Mandy Jo's Law must be done on a case-by-case basis. Based on Kimbler's undisputed failure to satisfy his child support obligation with isolated exceptions, the questionable nature of his visitation with Justin and general lack of involvement in fundamental areas of Justin's life such as education, the circuit court properly found that Kimbler willfully abandoned Justin. Accordingly, under Mandy Jo's Law, Kimbler is precluded from now sharing in the "benefits to which a parent is entitled when their minor child is taken from them much earlier than could ever be just," and the circuit court's order to that effect is affirmed.

ALL CONCUR.

---

26. *J.H., supra,* n. 19, at 663.