RENDERED:  FEBRUARY 5, 2021; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1856-MR

LAWRENCE MILLER, JR.                                                APPELLANT

|       | APPEAL FROM LETCHER CIRCUIT COURT |
|-------|-----------------------------------|
| v.    | HONORABLE JAMES W. CRAFT, II, JUDGE |
|       | ACTION NO. 15-CI-00023            |

BRITTANY BUNCH,
ADMINISTRATRIX OF THE
ESTATE OF AUTUMN RAINE
BUNCH; AND BRITTANY
BUNCH, INDIVIDUALLY                                                  APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; GOODWINE AND KRAMER,
JUDGES.

CLAYTON, CHIEF JUDGE:  Lawrence Miller, Jr. appeals from the amended

Findings of Fact, Conclusions of Law, Judgment and Order of the Letcher Circuit

Court entered on December 2, 2019.  Miller challenges the trial court's finding he

had abandoned his stillborn infant daughter and was consequently not entitled to any settlement proceeds or distribution from her estate under Kentucky Revised Statutes (KRS) 411.137 and KRS 391.033, collectively known as "Mandy Jo's Law." We affirm because the trial court's findings are supported by substantial evidence in the record, and its conclusion is in accordance with the law.

Brittany Bunch had a sexual relationship with Miller while they were co-workers. When Bunch discovered she was pregnant, she informed Miller who immediately left. He had no further contact with her, except for sending her a $25 Walmart MoneyGram which she used to purchase items for the baby. He did not attend doctor's appointments with her nor did he try to contact her. On May 27, 2014, when Bunch was 33 weeks and 4 days pregnant, she presented at the Whitesburg Appalachian Regional Healthcare (ARH) Hospital with symptoms of preeclampsia. The child, Autumn Raine Bunch, was stillborn the next day. Miller came to the hospital after Autumn was born and held her, but according to Bunch he was high. She told her father she wanted him to leave but Miller tried to return to Bunch's room and was eventually removed by security. Miller did not attend or contribute to Autumn's funeral.

Bunch, individually and as the administratrix of Autumn's estate, and Silas Lee Walker, Bunch's boyfriend, thereafter filed suit against Appalachian Regional Healthcare Inc. d.b.a. Whitesburg ARH, alleging negligence and seeking

damages for personal injury, wrongful death, and parental loss of minor's consortium. Several months later, Miller filed a complaint to intervene in the case, alleging that he, not Walker, was Autumn's natural father. A DNA test proved that Miller was the likely biological father, and Walker was voluntarily dismissed from the case. The case with ARH was settled.

After the settlement, Bunch sought to preclude Miller from receiving a share of the proceeds under Mandy Jo's Law, claiming he should not recover because he willfully abandoned Autumn. The Letcher Circuit Court conducted an evidentiary hearing and entered an order directing the settlement proceeds to be paid entirely to Bunch. Miller moved the court to make findings of fact and conclusions of law. The trial court granted the motion and entered findings of fact and conclusions of law making specific findings that Miller had abandoned Autumn and was precluded from recovering settlement proceeds arising out of her death and damages through her estate. Miller filed a motion to alter, amend, or vacate. Following a hearing, the trial court entered amended findings of fact and conclusions of law containing minor changes that did not affect its primary holding that Miller was precluded from receiving any portion of the settlement funds. Following several motions and a hearing that have no bearing on this issue, Miller filed this appeal.

KRS 411.130(1) authorizes individuals to recover damages from the negligence or wrongful act of a person resulting in the death of another person. It provides that "[w]henever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it. If the act was willful or the negligence gross, punitive damages may be recovered. The action shall be prosecuted by the personal representative of the deceased." Under KRS 411.135, when the deceased person is a minor child, "the surviving parent, or parents, may recover for loss of affection and companionship that would have been derived from such child during its minority, in addition to all other elements of the damage usually recoverable in a wrongful death action."

Mandy Jo's Law is comprised of two statutes, KRS 391.033 and KRS 411.137, which preclude parents from recovery of damages for the wrongful death and loss of consortium of their child under certain conditions. KRS 391.033(1) provides that "[a] parent who has willfully abandoned the care and maintenance of his or her child shall not have a right to intestate succession in any part of the estate and shall not have a right to administer the estate of the child[.]" Under KRS 411.137(1), "[a] parent who has willfully abandoned the care and maintenance of his or her child shall not have a right to maintain a wrongful death action for that

child and shall not have a right otherwise to recover for the wrongful death of that child[.]"

Thus, Mandy Jo's Law precludes a parent from recovery if the parent willfully abandoned his or her child. For purposes of Mandy Jo's Law, abandonment is defined as "neglect and refusal to perform natural and legal obligations to care and support, withholding of parental care, presence, opportunity to display voluntary affection and neglect to lend support and maintenance." *Kimbler v. Arms*, 102 S.W.3d 517, 522 (Ky. App. 2003) (citation omitted). "[G]enerally, abandonment is demonstrated by facts or circumstances that evince a settled purpose to forego all parental duties and relinquish all parental claims to the child." *Id*. at 523 (quoting *J.H. v. Cabinet for Human Resources*, 704 S.W.2d 661, 663 (Ky. App. 1985)).

Based on Bunch's deposition testimony, the trial court found that Miller knew he was Autumn's father because he left Bunch immediately after she informed him she was pregnant. The court further found that at no point did he provide any support, whether financial, emotional or otherwise, to Bunch or the child, except for the $25 Walmart MoneyGram. He was not present at any doctors' appointments with Bunch, nor did he contribute to or attend the funeral services for Autumn.

Because this case was decided by the court without a jury, on the basis of deposition testimony, our standard of review is deferential to the trial court's findings of fact, which "shall not be set aside unless clearly erroneous[.]" Kentucky Rules of Civil Procedure (CR) 52.01. "A factual finding is not clearly erroneous if it is supported by substantial evidence[,]" *Gosney v. Glenn*, 163 S.W.3d 894, 898 (Ky. App. 2005), which is defined as evidence which "has sufficient probative value to induce conviction in the mind of a reasonable person." *Id*. (citations omitted). The trial court's conclusions of law, however, are reviewed *de novo*. *Id*.

Miller argues that his conduct does not meet the definition of abandonment because even Bunch did not know he was Autumn's father, as evidenced by Walker's being named as the father in the wrongful death complaint. He contends he did not know he was the child's father until DNA testing was performed. If Miller did not strongly suspect he was the child's father, his actions in sending Bunch the MoneyGram and going to the hospital after the child's birth and holding her are inexplicable. The trial court found clear intent on Miller's part to abandon the child as evidenced by his behavior in fleeing immediately after Bunch informed him she was pregnant and thereafter making no further contact. It is axiomatic that the existence of some evidence contrary to the trial court's findings does not justify reversal. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky.

2003). "[J]udging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court." *Id.* The trial court's findings in this case are supported by substantial evidence in the form of Bunch's deposition testimony.

Miller further argues that KRS 411.137, which precludes wrongful death recovery to a parent who has willfully abandoned the care and maintenance of his child, as a matter of law, does not apply to a situation involving a child who is stillborn.

The predecessor to the Kentucky Supreme Court held that a fetus is viable when "the child has reached such a state of development that it can presently live outside the female body as well as within it." *Mitchell v. Couch*, 285 S.W.2d 901, 905 (Ky. 1955). In Kentucky, "[o]nce the stage of viability is reached the fetus is regarded as a legal 'person' with a separate existence of its own. It is the living child of its mother and father—it has a family and resides wherever its mother resides." *Orange v. State Farm Mut. Auto. Ins. Co.*, 443 S.W.2d 650, 651 (Ky. 1969). "The most cogent reason . . . for holding that a viable unborn child is an entity within the meaning of the general word 'person' is because, biologically speaking, such a child is, in fact, a presently existing person, a living human being." *Mitchell*, 285 S.W.2d at 905. *Mitchell* extended the application of KRS 411.130 to the death of viable fetuses, holding that a wrongful death action may be

maintained where the death of a viable fetus results from the negligence of another party. *Id.*

Based on the deposition testimony of medical expert witnesses in the underlying wrongful death action, the trial court found that Autumn, at 33 weeks and four days, was a viable fetus. Therefore, she was a legal person with a separate existence of her own, and a cause of action could be maintained for her wrongful death just as it could for the wrongful death of any other child.

Although Autumn's viability is not in dispute here, Miller contends that he was never given the chance to give his child support or to display voluntary affection and care because she was stillborn, and Bunch had led Walker to believe he was the father. He contends that he and Bunch are identically situated in that neither was given the opportunity to have a "normal parent-child relationship" with Autumn, and it cannot be said that one parent's loss of consortium is greater than that of the other. Because no opportunity to develop a relationship existed, Miller argues he could not have willfully abandoned Autumn.

He attempts to distinguish his case from *Kimbler*, in which Mandy Jo's Law precluded the father of a nine-year-old child killed in a car accident from recovering for his wrongful death because the father rarely paid his child support obligation, failed to exercise visitation, was uninvolved in the child's education, and did not attend his funeral. *Kimbler*, 102 S.W.3d at 520, 525. Miller contends

that, unlike the father in *Kimbler*, he was never given the opportunity to provide support for Autumn and was led to believe another man was the father. He also cites to an unpublished opinion of this Court which affirmed the trial court's holding that a father was not precluded from loss of consortium damages by Mandy Jo's Law even though he failed to timely pay child support for his son, was $4,000 in arrears in child support, was uninvolved in his life, and did not regularly exercise his visitation rights. *Big Spring Assembly of God, Inc. v. Stevenson*, No. 2012-CA-001350-MR, 2014 WL 4267433, at *4-5 (Ky. App. Aug. 29, 2014).

Substantial evidence supported the trial court's determination that Miller knew he was the father of Autumn. Miller appears to premise a finding of willful abandonment on whether a social relationship or opportunity to develop a social relationship existed between the parent and child. He has provided no legal basis to support this contention. Under Miller's argument, no one would be precluded from recovery for the wrongful death of a viable fetus on the grounds of abandonment because no one can develop a social relationship with a child who is not yet born. All parents with a claim for the wrongful death of a viable fetus would be excused from the application of Mandy Jo's Law regardless of whether or not they have fulfilled their parental obligations to support the viable fetus. There is no indication that this was the intent of Mandy Jo's Law. Miller fails to acknowledge that the parental relationship begins prior to birth and extends beyond

a social relationship with the child. The parental relationship includes the obligation to provide nurture, care, support, and maintenance, and this obligation begins before the child is born. As the trial court stated, "a viable fetus requires nurturing, care, support, and maintenance, and Miller refused to provide any such support." With the sole exception of his visit to the hospital after the stillbirth, Miller was willfully absent from Bunch's life after she informed him of her pregnancy. By abandoning Bunch and offering no support, whether emotional or financial, apart from the $25 MoneyGram, Miller effectively abandoned Autumn.

For the foregoing reasons, the amended Findings of Fact, Conclusions of Law, Judgment and Order of the Letcher Circuit Court holding that Miller is precluded by Mandy Jo's Law from recovery of damages from the settlement proceeds is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Kevin W. Johnson
Hazard, Kentucky

BRIEF FOR APPELLEES:

Stephen M. O'Brien, III
Kevin Beiting
Lexington, Kentucky

Daniel F. Dotson
Whitesburg, Kentucky