RENDERED: JULY 9, 2021; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0902-MR

KATELYN TRAPP JOHNSON                                          APPELLANT


APPEAL FROM BOONE CIRCUIT COURT
v.            HONORABLE JAMES R. SCHRAND, II, JUDGE
ACTION NO. 18-CI-00594


THE ESTATE OF CHASE MATTHEW
TRAPP KNAPP BY MATTHEW
KNAPP; ASHLEY MILLER;
MATTHEW KNAPP; AND
PROGRESSIVE DIRECT
INSURANCE COMPANY                                             APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE: MAZE, TAYLOR, AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE: Katelyn Trapp Johnson appeals the Boone Circuit

Court's decision to grant summary judgment to Matthew Knapp. Katelyn and

Matthew were the biological parents of Chase Matthew Trapp Knapp,[1] a young minor who tragically died. The end result of the summary judgment is that Katelyn is prohibited from receiving any proceeds stemming from Chase's death pursuant to Mandy Jo's Law (Kentucky Revised Statutes (KRS) 391.033 and 411.137). We affirm.

At eighteen, Katelyn had a child with Chris Johnson. Katelyn and Chris broke up when Katelyn was nineteen and Katelyn became pregnant with a child conceived with Matthew (Chase). While pregnant with Chase, Katelyn told Matthew that she had neither the financial resources nor living space for another child, so he could take the child after its birth or she would place the child for adoption with a family friend. Katelyn testified at her deposition that she believed that Matthew and his family "could provide better" for the child than she could have, and that she "knew I couldn't give Chase everything like Matthew and his family could." Seemingly contradictorily, at her deposition Katelyn testified that she "didn't want to give him [Chase] up, but Matthew made it very clear that it would have been an argument if I tried to get him [presumably Chase] back." Katelyn also stated that the "whole time" she was pregnant with Chase that

---

[1] We will use first names to avoid potential confusion. Apparently, Chase's actual surname was Trapp but Matthew referred to "Chase Matthew Trapp Knapp" when seeking an administrator for Chase's estate in district court. As it is not an issue before us, we express no opinion on the propriety of that decision.

Matthew had "threatened" to say to "Social Services" that she was "a bad Mom. He threatened [to go to] court. He threatened [to hire] lawyers. It was just—I was scared to go and lose my kids over trying to get one back."

Before Chase was born, Katelyn and Chris resumed their relationship, which Matthew testified at his deposition "just really hit me" because he was afraid of losing the love of his child if Katelyn raised him alongside Chris. Thus, at some point during the pregnancy, Matthew severed communication with Katelyn. For example, Mathew changed his phone number and blocked her from accessing his social media sites. Katelyn testified that she attempted to keep up with Chase's development from afar, by doing things like creating a fake Facebook account to view pictures of Chase posted by Matthew since her true account was blocked. Matthew admitted that he had little to no direct contact with Katelyn during her pregnancy with Chase and that he "was pretty much blocking her, like, out." But Matthew denied having blocked Katelyn from his Facebook account.

Matthew was present at the hospital when Chase was born in November 2015. In fact, though he admitted that he knew Katelyn had wanted only her mother present, Matthew entered the delivery room and cut the umbilical cord.

Still estranged, Matthew and Katelyn did not talk at the hospital. However, after Chase left the hospital he went to live with Matthew, a living arrangement that continued for the duration of Chase's tragically short life.

Katelyn admitted in her deposition that she did not see Chase after he left the hospital and went to live with Matthew, until he was hospitalized and near death. According to Katelyn, she "wasn't given the option" to see Chase during his life because she "had no way of contacting anybody" due to not having "anybody's phone number" and her being "scared to deal with all of the confrontation that it would have caused." Matthew, on the other hand, testified in his deposition that Katelyn "knew where we lived" and that it "would have been fine if she just came over to the house[.]" However, Matthew admitted he never reached out to Katelyn to inform her about Chase during his tragically short life and that it would have "bothered" him and created a "very, very big issue" if Katelyn had tried to take Chase for a visit to the home she shared with Chris and her other children.

When asked at her deposition if she had "ever provide[d] any support for Chase during his lifetime[,]" Katelyn answered "[n]o, because I didn't know Matthew needed support. I was never informed that he needed anything. I would have in a heartbeat if I was informed he needed anything." Katelyn also admitted she never sent Chase gifts or asked about his health prior to the tragic accident,

maintaining she "didn't have the option to ask" because she "didn't have any contact information" because Matthew "blocked me [Katelyn] on everything and changed his phone number[.]" In fact, Katelyn testified that she did not talk to anyone in Matthew's family about Chase during Chase's lifetime, though she was adamant that Matthew's family "didn't give [her] the option" to ask about Chase. Finally, Katelyn testified at her deposition that she did not visit an attorney or take any legal action regarding visitation, custody or formal relinquishment of her parental rights during Chase's lifetime.

In October 2017, Ashley Miller, Chase's babysitter, had a vehicular accident while Chase was a passenger. Tragically, Chase sustained fatal injuries and passed away two days later.

In April 2018, Matthew filed the underlying wrongful death action, on behalf of himself and as administrator of Chase's estate, against Progressive Direct Insurance Company (his insurer), Ashley Miller, and the Cabinet for Health and Family Services (related to possible Medicaid reimbursement or subrogation). Matthew named Katelyn as an involuntary plaintiff and a cross-claim respondent. For purposes of this appeal, Matthew's complaint stated that he had reached an agreement with his insurer "for the payment of funds related to the wrongful death of . . . Chase Knapp" but Katelyn's signature "may now be required on settlement documents and/or release documents" because she was Chase's biological mother.

Thus, Matthew sought a declaratory judgment finding that Katelyn had abandoned Chase and thus was not entitled to any wrongful death proceeds pursuant to Mandy Jo's Law. Katelyn filed cross-claims against Matthew, including alleging he had engaged in outrageous conduct which had caused her to suffer anxiety and embarrassment (essentially intentional infliction of emotional distress, though Katelyn does not appear to use that term).

The trial court granted Ashley and Progressive's motion to bifurcate Matthew's and Katelyn's claims against each other. In April 2019, the trial court granted Matthew's motion for summary judgment, concluding there was no dispute that Katelyn had "willfully abandoned the care and maintenance of Chase and, therefore, is not entitled to either participate as a representative of or administer Chase's estate, nor is she entitled to any share or distribution from the estate or proceeds recovered from the wrongful death or loss of consortium claims." At Katelyn's request, the trial court made its grant of summary judgment to Matthew final and appealable in May 2019. Katelyn then filed this appeal.

Under our familiar standards, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Kentucky Rule of Civil Procedure (CR) 56.03. Our

Supreme Court has fleshed out CR 56.03 by holding that:

> The trial court must view the evidence in the light most favorable to the nonmoving party, and summary judgment should be granted only if it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in his favor. The moving party bears the initial burden of showing that no genuine issue of material fact exists, and then the burden shifts to the party opposing summary judgment to present at least some affirmative evidence showing that there is a genuine issue of material fact for trial. The trial court must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists. The word "impossible," as set forth in the standard for summary judgment, is meant to be used in a practical sense, not in an absolute sense. Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue de novo.

*Blackstone Mining Co. v. Travelers Ins. Co.*, 351 S.W.3d 193, 198 (Ky. 2010)

(internal quotation marks and citations omitted).

Before determining whether summary judgment was appropriate due

to an absence of genuine issues of material facts, we must first address Katelyn's

antecedent argument that the determination of whether Mandy Jo's Law applies

cannot properly be done without holding an evidentiary hearing or bench trial. We

disagree.

As of now, there are only two published Kentucky appellate opinions addressing Mandy Jo's Law: *Simms v. Estate of Blake*, 615 S.W.3d 14 (Ky. 2021),[2] and *Kimbler v. Arms*, 102 S.W.3d 517 (Ky.App. 2003). We decline to address the unpublished cases cited by the parties as *Simms* and *Kimbler* provide adequate guidance. Katelyn correctly notes that the trial courts in both of those cases held either an evidentiary hearing (*Kimbler*) or bench trial (*Simms*) before applying Mandy Jo's Law. But neither opinion mandates holding an evidentiary hearing or bench trial before determining whether Mandy Jo's Law applies. Instead, we conclude the decision of whether to apply Mandy Jo's Law falls squarely within our time-tested summary judgment framework: the proponent of applying Mandy Jo's Law "bears the initial burden of showing that no genuine issue of material fact exists, and then the burden shifts to the party opposing summary judgment [*i.e.*, the parent who allegedly abandoned a child] to present at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Blackstone Mining Co.*, 351 S.W.3d at 198.

There often will be disputed, material issues of fact concerning the nature and extent of support and involvement by the parent who allegedly abandoned the child. In those situations, summary judgment is inappropriate.

---

[2] Katelyn argues the trial court erred by not granting her request to stay the proceedings until our Supreme Court issued its decision in *Simms*. We deem that argument moot since *Simms* has now been issued and, in any event, its holding and analysis support the trial court's ultimate decision.

However, if the relevant facts are uncontested—as they are here, as will soon be discussed—it is appropriate for a trial court to apply Mandy Jo's Law via settled summary judgment principles.

Before we address the merits of the summary judgment decision, we must first address some of Katelyn's other ancillary arguments. First, Katelyn argues Mandy Jo's Law is unclear about, among other things, the appropriate burden of proof. That issue is now settled as our Supreme Court has held that "trial courts must use the preponderance of the evidence standard when considering claims under Mandy Jo's Law." *Simms*, 615 S.W.3d at 23. We also decline to address Katelyn's unpreserved, terse challenges to the constitutionality of Mandy Jo's Law as she admits she failed to timely notify the Attorney General of her constitutional arguments, as is required by KRS 418.075(1). *Benet v. Commonwealth*, 253 S.W.3d 528, 532-33 (Ky. 2008).[3]

---

[3] Although Katelyn's failure to comply with the notification requirement in KRS 418.075 means the issue is not preserved for our review, we note that our Supreme Court has explained that:

> Unlike a parent's right to the care and custody in their children, the question of who shall inherit what is firmly a legislative one. Though this legislative power is limited by constitutional provisions, a person does not have a constitutional right to an inheritance. Similarly, while the Kentucky Constitution guarantees the right of kin to maintain a wrongful death cause of action, it simultaneously empowers the General Assembly to define the parameters of that right. The right to the care and custody of one's child is quite different: it is independently protected as a fundamental right. Thus, Mandy Jo's Law does not infringe on a parent's constitutional rights. Rather, it is a statute that alters and limits other *statutory rights*.

*Simms*, 615 S.W.3d at 22-23 (internal footnotes and citations omitted).

We now turn to the heart of this appeal—determining whether the trial court's application of Mandy Jo's Law was appropriate. Because the record before us shows there to be no genuine issues of material fact regarding whether Katelyn abandoned Chase, we affirm.

Though referred to with the singular "law," Mandy Jo's Law actually consists of two related statutes which "[c]ollectively . . . prevent a parent who has willfully abandoned the care and maintenance of his or her child from maintaining a wrongful death action for that child, from administering the child's estate, or from inheriting any part of the child's estate through intestate succession." *Simms*, 615 S.W.3d at 19 (internal quotation marks omitted). KRS 411.137 provides:

> (1) A parent who has willfully abandoned the care and maintenance of his or her child shall not have a right to maintain a wrongful death action for that child and shall not have a right otherwise to recover for the wrongful death of that child, unless:
>
> (a) The abandoning parent had resumed the care and maintenance at least one (1) year prior to the death of the child and had continued the care and maintenance until the child's death; or
>
> (b) The parent had been deprived of the custody of his or her child under an order of a court of competent jurisdiction and the parent had substantially complied with all orders of the court requiring contribution to the support of the child.
>
> (2) This section may be cited as Mandy Jo's Law.

Similarly, KRS 391.033 provides:

> (1) A parent who has willfully abandoned the care and maintenance of his or her child shall not have a right to intestate succession in any part of the estate and shall not have a right to administer the estate of the child, unless:
>
> > (a) The abandoning parent had resumed the care and maintenance at least one (1) year prior to the death of the child and had continued the care and maintenance until the child's death; or
> >
> > (b) The parent had been deprived of the custody of his or her child under an order of a court of competent jurisdiction and the parent had substantially complied with all orders of the court requiring contribution to the support of the child.
>
> (2) Any part of a decedent child's estate prevented from passing to a parent, under the provisions of subsection (1) of this section, shall pass through intestate succession as if that parent has failed to survive the decedent child.
>
> (3) This section may be cited as Mandy Jo's Law.

The net impact of both statutes is to "limit[] the ability of a parent who has forgone participation in the child's care and upbringing from enriching themselves in the event that their child predeceases them." *Simms*, 615 S.W.3d at 19.

The crux of deciding whether to apply Mandy Jo's Law is determining whether the parent has abandoned the child. And Katelyn is correct

-11-

that the statutes do not meaningfully define abandonment.  But precedent does.

Specifically, we held in *Kimbler*:

> for the purposes of applying Mandy Jo's Law, abandon means neglect and refusal to perform natural and legal obligations to care and support, withholding of parental care, presence, opportunity to display voluntary affection and neglect to lend support and maintenance . . .  It means also the failure to fulfill responsibility of care, training and guidance during the child's formative years. Further, as correctly observed by the circuit court, the differing factual situations that are likely to appear in this context make a bright line rule impossible, and, as such, analysis under Mandy Jo's Law must be done on a case-by-case basis.

*Kimbler*, 102 S.W.3d at 525 (internal quotation marks, footnote, and citation omitted).  Our Supreme Court specifically adopted *Kimbler*'s definition of abandonment in *Simms*, 615 S.W.3d at 24, and also held that "a court must assess the facts and circumstances of the case at hand to determine if the parent's conduct demonstrated an intent to both support the child monetarily and care for the child as a parent." *Id.*

In this case, there were no factual disputes regarding the lack of actions by Katelyn to monetarily support Chase or to provide care for him from the time he left the hospital where he was born until he was treated at the hospital where he tragically died.  And despite arguments about the motivations for Katelyn's lack of action to provide financial support or parental care for Chase, there is nothing in the record to indicate that she did not act intentionally in

-12-

deciding to let Matthew and his family assume sole responsibility for Chase's care and financial support and in not taking further action to provide care or financial support herself during Chase's lifetime.

Though the parties each cast blame and aspersions on the other in this emotionally charged case, the proper question before us is not whether Matthew or Katelyn behaved admirably. We resolve legal disputes, not ethical dilemmas. Thus, the first question we must answer is objective and narrow: are there any genuine issues of material fact? The answer is no, since Matthew and Katelyn agree about Katelyn's involvement, or lack thereof, in Chase's life. Based upon those undisputed facts, the second question we must answer is: did Katelyn abandon Chase? The answer is yes.

Though her motivation(s) for letting Matthew raise Chase arguably may have been admirable, it is nonetheless an undisputed fact that Katelyn offered no financial support whatsoever for Chase's care and upbringing. Katelyn testified that she would have provided support if asked, but, regardless, it is undeniable that she did not do so. Since she had other children it is inescapable that Katelyn knew that raising a child is not a cost-free experience. Indeed, one of her self-professed reasons for allowing Matthew to raise Chase was her own lack of financial resources. So, regardless of whether she would have responded positively to a request for aid that never came, the bottom line is that Katelyn gave Matthew no

funds to help provide Chase with food, shelter, clothing, or any other necessities of life.

It is also undisputed that Katelyn did not spend any time at all with Chase once he left the hospital soon after his birth. Admittedly, Matthew—rightly or wrongly—did not make it easy for Katelyn to stay involved in Chase's life. But Katelyn made no meaningful effort to overcome any obstacles which Matthew placed in her parenting path. Matthew and Chase resided in the same vicinity as Katelyn, but she did not attempt to visit or call Chase, nor did she call Matthew's family to inquire about Chase's well-being and development. She did not send Chase gifts. She did not seek custody or visitation via the judicial system. In sum, she played no role at all in Chase's life after he left the hospital where he was born. Consequently, Katelyn's complete lack of involvement in Chase's life, regardless of her subjective reasons, demonstrates her "failure to fulfill [the] responsibility of care, training and guidance during the child's formative years"—among the hallmarks of abandonment for purposes of applying Mandy Jo's Law. *Kimbler*, 102 S.W.3d at 525.

Katelyn asserts she was fearful of creating a conflict with Matthew or his family, so she did not try to be an active participant in Chase's life. And it is likely that conflict would have ensued if, for example, Katelyn had attempted to take Chase to her home for a visit. But there were no impediments, such as

extreme geographical distances between her residence and Chase's, which prevented Katelyn from at least trying to play an active role in Chase's life. And there were no barriers preventing Katelyn from seeking relief via the judicial system if she had been unable to reach an amicable agreement with Matthew about being involved in Chase's life. In other words, Katelyn's aversion to causing conflict does not change the fact that she voluntarily abandoned Chase by intentionally failing to provide *any* parental support or nurture after he left the hospital where he was born.

Finally, Katelyn correctly notes that she would have had to overcome some challenges to be a meaningful part of Chase's life, given Matthew's hostility and cessation of contact. But those challenges were surmountable with the exercise of diligence and persistence including, if necessary, seeking relief in court. Katelyn admits she was uninvolved in Chase's life but stresses her motivation for her inaction was pure. But, again, the question before us is not whether Katelyn had noble motivations. The proper question instead is whether the facts show that she abandoned Chase. In other words, for purposes of determining whether Mandy Jo's Law applies, actions speak louder than words and Katelyn's actions, or inactions, demonstrate she voluntarily abandoned *all* parental care and support for Chase.

-15-

In conclusion, the undisputed facts here show that Katelyn abandoned Chase since she admits she never saw him (or attempted to see him), never talked to him (or attempted to talk to him), and never gave Matthew any money for Chase's care. Instead, she voluntarily relinquished her parental responsibilities, other than during the hospital stays which bookended his short life. Indeed, the father in *Simms* was found to have abandoned his son despite having made regular support payments and having seen or corresponded occasionally with his son (though infrequently, if at all, in the years immediately preceding the son's death). *Simms*, 615 S.W.3d at 24-25. Consequently, we affirm the trial court's grant of summary judgment to Matthew such that Mandy Jo's Law applies to Katelyn.

For the foregoing reasons, the Boone Circuit Court is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Jerry M. Miniard
Florence, Kentucky

BRIEF FOR APPELLEES
MATTHEW KNAPP AND THE
ESTATE OF CHASE MATTHEW
TRAPP KNAPP:

Blake R. Maislin
Ronald C. Taylor, Jr.
Cincinnati, Ohio