RENDERED: DECEMBER 15, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0071-DG

LAWRENCE MILLER, JR.                                        APPELLANT


|  | ON REVIEW FROM COURT OF APPEALS |  |
|---|---|---|
| V. | NO. 2019-CA-1856 |  |
|  | LETCHER CIRCUIT COURT NO. 15-CI-00023 |  |


BRITTANY BUNCH, INDIVIDUALLY AND AS               APPELLEE
ADMINISTRATRIX OF THE ESTATE
OF AUTUMN RAINE BUNCH


**OPINION OF THE COURT BY JUSTICE LAMBERT**

**REVERSING & REMANDING**

In the underlying action, the Letcher Circuit Court found that Lawrence Miller, Jr. (Mr. Miller) willfully abandoned his stillborn daughter, Autumn Raine Bunch (Autumn). Based on this finding, the circuit court ruled that KRS[1] 411.137 and KRS 391.033, collectively known as Mandy Jo's Law, prevented Mr. Miller from being awarded any of the settlement proceeds from the wrongful death action against the hospital where Autumn was born. Mr. Miller appealed the circuit court's ruling to the Court of Appeals, which affirmed. After thorough review, we reverse and hold that Mandy Jo's Law, as currently written, is not applicable when the child in question is stillborn.

---

[1] Kentucky Revised Statute.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2013, Mr. Miller was dating Autumn's mother, Brittany Bunch (Ms. Bunch). The couple broke up in late 2013 due, in part, to the fact that Mr. Miller discovered Ms. Bunch was also sleeping with another man, Silas Walker (Mr. Walker). On October 31, 2013, shortly after Mr. Miller and Ms. Bunch separated, Ms. Bunch discovered she was pregnant. In November 2013, Ms. Bunch met with Mr. Miller and showed him the positive pregnancy test. Ms. Bunch also met with Mr. Walker and showed him the pregnancy test. Ms. Bunch and Mr. Walker began dating in December 2013, and then remained together throughout her pregnancy.

Ms. Bunch had a difficult pregnancy and had to be hospitalized three or four times due to complications. On May 27, 2014, she was admitted to the hospital at thirty-three weeks and four days. She was exhibiting symptoms of preeclampsia, and an emergency Caesarean section was performed the next day. Tragically, Autumn did not survive the birth.

In December 2014, Ms. Bunch was appointed the Administratrix of Autumn's Estate by an order of the Letcher District Court. A month later, Ms. Bunch filed suit against the hospital alleging, *inter alia*, wrongful death. Mr. Walker was named in the complaint as a co-plaintiff, and the complaint stated that "[t]he Plaintiffs, Brittany Bunch and Silas Lee Walker are the natural parents of Autumn Raine Bunch." Ms. Bunch did not tell Mr. Miller about the suit, and he instead found out about it from a friend. In May 2015, Mr. Miller filed a motion to intervene in the suit based upon his allegation that he, not

2

Mr. Walker, was Autumn's biological father. He then filed a motion for an order to compel DNA testing. That testing would ultimately prove Mr. Miller's paternity, and Mr. Walker was dismissed as a plaintiff in September 2017.

After several years of litigation, the hospital, Ms. Bunch, and Mr. Miller reached a settlement of all the claims and the hospital was released from the litigation. Shortly thereafter, in July 2019, Ms. Bunch requested that the circuit court hold a hearing to determine the division of the settlement funds. Ms. Bunch asserted that Mr. Miller abandoned Autumn, prior to her birth, and therefore he should not be awarded any of the settlement proceeds in accordance with Mandy Jo's Law. In defense, Mr. Miller contended that Mandy Jo's Law was inapplicable because it only pertains to the support, care, and maintenance of a living child post-birth, and not an unborn child *in utero*.

During the hearing, Ms. Bunch testified that when she showed Mr. Miller her positive pregnancy test in November 2013, he did not say anything or ask her if she needed anything. Mr. Miller did not ask her if he was the father of the child at that time, however he subsequently requested a DNA test that apparently did not occur. Ms. Bunch alleged the following: she attempted to get Mr. Miller to go to her doctor's appointments with her, but he refused; Mr. Miller only sent her a $25 money gram to Walmart in January or February 2014, but provided no other financial assistance to her; Mr. Miller never came to visit her during her hospitalizations; and he did not come to, or help pay for, Autumn's funeral. Mr. Miller did come to the hospital on the day Autumn was born, but Ms. Bunch believed he was high and made him leave. When

3

confronted with the fact that she named Mr. Walker as Autumn's father in her wrongful death action against the hospital, Ms. Bunch stated that she did so because "he could have been her father."

Mr. Miller's testimony attempted to refute all of Ms. Bunch's substantive claims. Specifically, he testified that he gave her more than $25 during her pregnancy; that he went to one of her doctor's appointments with her; that he only knew of one time she was hospitalized and that he spoke to her on the phone for an hour thereafter; that he was not high when he came to the hospital, and was only made to leave when he said something about fighting Mr. Walker, who was also present that day; and that he was told by Ms. Bunch's family not to attend Autumn's funeral.

The circuit court ultimately found Ms. Bunch to be more credible and ruled in her favor. In its findings of fact, conclusions of law, and order, the court found that Mandy Jo's Law was applicable. Though the court did not state so explicitly, it seemed to base this conclusion on the fact that Kentucky permits a wrongful death suit for the death of a viable fetus. As it was undisputed that Autumn was a viable fetus, the court concluded Mandy Jo's Law could apply. With regard to whether Mr. Miller willfully abandoned Autumn, the court made the following findings:

> The record in this case makes clear and the Court finds that the Intervening Plaintiff, Lawrence Miller, Jr., willfully abandoned Ms. Bunch when he learned that she had become pregnant and that he might be the father of her unborn child. Because he abandoned Ms. Bunch and her unborn child in their time of need, the Intervening Plaintiff, Lawrence Miller, Jr., has no claim to wrongful death damages . . . In fact, testimony in this case shows that Mr. Miller abandoned Ms. Bunch as soon as he learned she was

4

pregnant . . . Further testimony establishes that Mr. Miller offered no support, financial or otherwise, to Ms. Bunch during her pregnancy, other than a $25.00 money gram to be used at Walmart . . . Testimony in the case also shows that Mr. Miller did not contribute to or even attend the funeral service for Autumn Raine Bunch[.]

In *Hafley v. McCubbins*, 590 S.W.2d 892, 894 (Ky. [App.] 1979), the Court of Appeals defined what it means to abandon a child in the context of a civil wrongful death claim. The *Hafley* Court held that to abandon a child meant "neglect and refusal to perform natural and legal obligations to care and support, withholding of parental care, presence, opportunity to display voluntary affection and neglect to lend support and maintenance." In *Kimbler v. Arms*, 102 S.W.3d 517, 522 (Ky. [App.] 2003), the Court of Appeals adopted this definition of abandonment "in relation to Mandy Jo's Law."

The record in this case makes it clear that Lawrence Miller, Jr., neglected and refused to offer care and support to Ms. Bunch and Autumn. The record shows that Mr. Miller ran away from Ms. Bunch as soon as he learned she was pregnant, and other than sending a $25.00 money gram to Walmart, contributed nothing to the care and maintenance of Ms. Bunch and her unborn child. Mr. Miller did not visit Ms. Bunch to offer her support, nor did he attend any of her doctor's appointments during the pregnancy . . . He did not even attend the funeral service for Autumn. Mr. Miller willfully abandoned Autumn from the moment he learned of her existence. Through the operation of Mandy Jo's Law, KRS §411.137 . . . Mr. Miller is precluded from recovering for the wrongful death of Autumn, and as such is not entitled to any proceeds from the settlement of this case.

Mr. Miller appealed the circuit court's ruling to the Court of Appeals, which affirmed.[2] The Court of Appeals first disagreed with Mr. Miller's renewed argument that Mandy Jo's Law should not apply to a stillborn child. It reasoned:

The predecessor to the Kentucky Supreme Court held that a fetus is viable when "the child has reached such a state of development that it can presently live outside the female body as well as within

---

[2] *Miller v. Bunch*, 2019-CA-1856-MR, 2021 WL 402552 (Ky. App. Feb. 5, 2021).

5

it." *Mitchell v. Couch*, 285 S.W.2d 901, 905 (Ky. 1955). In Kentucky, "[o]nce the stage of viability is reached the fetus is regarded as a legal 'person' with a separate existence of its own. It is the living child of its mother and father—it has a family and resides wherever its mother resides." *Orange v. State Farm Mut. Auto. Ins. Co.*, 443 S.W.2d 650, 651 (Ky. 1969). "The most cogent reason . . . for holding that a viable unborn child is an entity within the meaning of the general word 'person' is because, biologically speaking, such a child is, in fact, a presently existing person, a living human being." *Mitchell*, 285 S.W.2d at 905. *Mitchell* extended the application of KRS 411.130 to the death of viable fetuses, holding that a wrongful death action may be maintained where the death of a viable fetus results from the negligence of another party. *Id.*

Based on the deposition testimony of medical expert witnesses in the underlying wrongful death action, the trial court found that Autumn, at 33 weeks and four days, was a viable fetus. Therefore, she was a legal person with a separate existence of her own, and a cause of action could be maintained for her wrongful death just as it could for the wrongful death of any other child.[3]

Stated differently, the Court of Appeals seemed to reason that Mandy Jo's Law could be applicable to a case involving a stillborn child simply because the law of Kentucky permits a wrongful death suit for the death of a viable fetus. The court then upheld the circuit court's finding that Mr. Miller abandoned Autumn because the circuit court's factual findings were supported by substantial evidence.[4]

Additional facts are discussed below as necessary.

---

[3] *Id.* at *3.

[4] *Id.* at *4.

6

## II. ANALYSIS

As this case was tried by the circuit court without a jury, we cannot set aside its findings of fact if they are supported by substantial evidence; that is, "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men."[5] However, the crux of this case concerns statutory construction. Specifically, whether Mandy Jo's Law applies to cases involving a stillborn child. Statutory construction is an issue of law to be reviewed *de novo*.[6] Accordingly, neither the circuit court's nor the Court of Appeals' construction of Mandy Jo's Law is entitled to deference by this Court.[7]

It is a well-established tenet of statutory construction that our statutes must be liberally construed "with a view to promote their object and carry out the intent of the legislature."[8] "To determine legislative intent, we look first to the language of the statute, giving the words their plain and ordinary meaning. Further, we construe a statute only as written, and the intent of the Legislature must be deduced from the language it used, when it is plain and unambiguous[.]"[9]

Mandy Jo's Law prevents a parent from recovering damages from an action for the wrongful death of the child or from inheriting any part of the

---

[5] *Kimbler v. Arms*, 102 S.W.3d 517, 521-22 (Ky. App. 2003).

[6] *See, e.g.*, *Pearce v. Univ. of Louisville, ex rel. Bd. of Trs.*, 448 S.W.3d 746, 749 (Ky. 2014).

[7] *Id.*

[8] KRS 446.080(1).

[9] *Pearce*, 448 S.W.3d at 749 (internal citations and quotation marks omitted).

7

child's estate if that parent has "willfully abandoned the care and maintenance of his or her child."  Mandy Jo's Law is comprised of two separate statutes, the language of each is nearly identical.  The first statute, KRS 411.137, provides in its entirety:

> (1) A parent who has willfully abandoned the care and maintenance of his or her child shall not have a right to maintain a wrongful death action for that child and shall not have a right otherwise to recover for the wrongful death of that child, unless:
>
>> (a) The abandoning parent had resumed the care and maintenance at least one (1) year prior to the death of the child and had continued the care and maintenance until the child's death; or
>>
>> (b) The parent had been deprived of the custody of his or her child under an order of a court of competent jurisdiction and the parent had substantially complied with all orders of the court requiring contribution to the support of the child.
>
> (2) This section may be cited as Mandy Jo's Law.

Its companion statute, KRS 391.033, similarly states:

> (1) A parent who has willfully abandoned the care and maintenance of his or her child shall not have a right to intestate succession in any part of the estate and shall not have a right to administer the estate of the child, unless:
>
>> (a) The abandoning parent had resumed the care and maintenance at least one (1) year prior to the death of the child and had continued the care and maintenance until the child's death; or
>>
>> (b) The parent had been deprived of the custody of his or her child under an order of a court of competent jurisdiction and the parent had substantially complied with all orders of the court requiring contribution to the support of the child.

8

(2) Any part of a decedent child's estate prevented from passing to a parent, under the provisions of subsection (1) of this section, shall pass through intestate succession as if that parent has failed to survive the decedent child.

(3) This section may be cited as Mandy Jo's Law.

The Legislature's overarching intent in passing Mandy Jo's Law is not difficult to discern. It believed, as a matter of public policy, that parents who forego participation in their child's upbringing should be prevented from enriching themselves in the event that the child predeceases them.[10] The murkier question, and the question this Court is now called upon to decide, is whether the plain language of Mandy Jo's Law evinces Legislative intent to preclude recovery by an abandoning parent when the child in question is stillborn. This is a matter of first impression for this Court, as our caselaw interpreting and applying Mandy Jo's Law entirely involves children who were no longer *in utero*.[11]

Preliminarily, this Court clarifies that we are not overruling our predecessor court's holdings in *Mitchell v. Couch* that a viable fetus is a "person" for the purposes of KRS 411.130, and that a wrongful death suit may

---

[10] *Simms v. Estate of Blake*, 615 S.W.3d 14, 19 (Ky. 2021).

[11] *Id.* at 18 (child was twenty-four years old); *Johnson v. Estate of Knapp by Knapp*, 635 S.W.3d 845, 847-48 (Ky. App. 2021) (child was one year and eleven months old); *Big Spring Assembly of God, Inc. v. Stevenson*, 2012-CA-001350-MR, 2014 WL 4267433, at *1 (Ky. App. Aug. 29, 2014) (child was thirteen years old); *Calhoun v. Sellers*, 2008-CA-001311-DG, 2009 WL 3231506, at *1 (Ky. App. Oct. 9, 2009) (children were two years old and four years old, respectively); *Shelton v. Parrish*, 2005-CA-002464-MR, 2007 WL 1207125, at *1 (Ky. App. Apr. 6, 2007) (child was thirty-six years old); *Kimbler*, 102 S.W.3d at 519 (child was nine years old).

9

accordingly be maintained for the negligent death of a viable fetus.[12]  However, this Court cannot hold that the Legislature contemplated the application of Mandy Jo's law to the situation now before us.

First, neither of the exceptions to Mandy Jo's Law could ever apply to a stillborn child.  The first exception, that "[t]he abandoning parent had resumed the care and maintenance [of the child] at least one (1) year prior to the death of the child," to state the obvious, could not apply to a stillborn child because the child would not yet be conceived one year prior to its death.  The second exception, that "[t]he parent had been deprived of the custody of his or her child under an order of a court of competent jurisdiction" likewise could not apply to a stillborn child because our courts do not enter custody orders for children until they are born.

Furthermore, while our case law regarding Mandy Jo's Law is extremely scant, the definition of "willful abandonment," is not applicable to a stillborn child.  Moreover, our precedent regarding what constitutes "care and maintenance" is not applicable to a stillborn child.  Neither "willful abandonment," nor "care and maintenance" are defined by statute.  However, in the twenty-two years since the passage of Mandy Jo's Law, our appellate system has developed a definition of abandonment, as well as a test for

_____

[12] 285 S.W.2d at 906 ("We believe the complaint stated a cause of action under KRS 411.130, because we conclude a viable child is a 'person' within the meaning of this statute.").

10

determining whether a parent has abandoned the care and maintenance of his or her child. "Abandonment" for the purposes of Mandy Jo's Law means the

> neglect and refusal to perform natural and legal obligations to care and support, withholding of parental care, presence, opportunity to display voluntary affection and neglect to lend support and maintenance . . . It means also the failure to fulfill responsibility of care, training and guidance during the child's formative years.[13]

As previously noted, as the statutes are currently written, no "legal obligations to care and support," i.e., child support and custody orders can be issued until a child is born. And how might a parent provide "presence" and "voluntary affection" to a child still in the womb? Finally, fulfilling the "responsibility, training and guidance during the child's formative years" is by its very wording only applicable to a child in his or her formative years. Certainly, one can provide financial and emotional support to the child's mother and perhaps indirectly benefit the child. But, looking at the current definition of abandonment, that definition can only apply to a child that has been born and is living separately from his or her mother.

In that vein, the facts previously considered by our courts to determine whether there has been willful abandonment cannot be applied to a case involving a stillborn child. Whether a parent has abandoned his or her child is consistently stated to be a highly fact-specific inquiry that must be considered on a case-by-case basis.[14] Though no fact is dispositive, those facts previously

---

[13] *Kimbler*, 102 S.W.3d at 525.

[14] *See, e.g.*, *id.* ("[T]he differing factual situations that are likely to appear in this context make a bright line rule impossible, and, as such, analysis under Mandy Jo's Law must be done on a case-by-case basis.").

considered by our courts include: payment of child support;[15] a involvement in the child's education;[16] spending time with the child;[17] knowledge of basic facts about the child such as favorite foods, names of child care providers, or diaper size;[18] seeking formal or informal visitation rights;[19] or providing funds to help provide the child with food, shelter, clothing, or any other necessities of life.[20]

From a practical perspective, what factors could a trial court consider in a case involving a stillborn? By necessity, just as the circuit court did in this case, a trial court could only consider what the alleged abandoning parent did for the child while he or she was still *in utero.* This, in turn, requires looking at what the abandoning parent did *for the other parent.* Indeed, in its opinion and order in this case, the circuit court faults Mr. Miller for "willfully [abandoning] Ms. Bunch" no less than three times. It further found that he "offered no support, financial or otherwise, to Ms. Bunch"; that he "neglected and refused to offer care and support to Ms. Bunch and Autumn"; that he "did not visit Ms. Bunch to offer her support"; and that he "contributed nothing to the care and maintenance of Ms. Bunch and her unborn child."

---

[15] *Id.,* 102 S.W.3d at 523 ("Although nonsupport is not decisive, it has uniformly been deemed one of the relevant factors for consideration[.]").

[16] *Id.,* 102 S.W.3d at 524 ("No credible argument can be made that education is not among the fundamental areas encompassed in the 'natural and legal obligations' of parenting.").

[17] *Id.*

[18] *Calhoun v. Sellers,* 2008-CA-001311-DG, 2009 WL 3231506, at *3 (Ky. App. Oct. 9, 2009).

[19] *See Simms,* 615 S.W.3d at 24.

[20] *Johnson,* 635 S.W.3d at 852.

Again, we acknowledge that by supporting and caring for the mother one provides at least some support and care for the child; to suggest otherwise would be disingenuous. But the Legislature's sole purpose in passing Mandy Jo's Law was to prevent a parent who has abandoned his or her child from benefitting financially from that child's untimely death. Accordingly, the dispositive inquiry under Mandy Jo's Law is whether a parent abandoned the child, not the mother. This, in turn, necessitates that the alleged abandoning parent has had a meaningful opportunity to be part of a child's life once the child is a living being separate from his or her mother. Consequently, without clear expression from our General Assembly, this Court cannot use Mandy Jo's Law to find willful abandonment of a child based solely on the nature of the relationship between the parents during the mother's pregnancy. This is particularly so in a case such as the one at bar wherein even Ms. Bunch acknowledged that Mr. Miller may not have been Autumn's father. It smacks of injustice to require a man who did not know for certain that the child was his until well after her death to provide financial and emotional support to the child's mother during her pregnancy. It also unfairly presumes that, had Autumn lived post-birth, Mr. Miller would not have sought custody rights once his paternity was confirmed.

### III.   CONCLUSION

For the foregoing reasons, we hereby reverse and remand with orders that the Letcher Circuit Court's Findings of Fact, Conclusions of Law,

13

Judgment, and Order be vacated and that a judgment be entered consistent with the holding herein.

All sitting. Conley, Hughes, Lambert and VanMeter, JJ., concur. Nickell, J., dissents by separate opinion, in which Minton, C.J.; Keller, J., join.

NICKELL, J., DISSENTING: Respectfully, I must dissent.

Although referred to as a singular law, Mandy Jo's Law is actually comprised of two separate but related statutes, KRS 391.033 and KRS 411.137. Together, these statutes "prevent a parent who has willfully abandoned the care and maintenance of his or her child from maintaining a wrongful death action for that child, from administering the child's estate, or from inheriting any part of the child's estate through intestate succession." *Simms v. Estate of Blake*, 615 S.W.3d 14, 19 (Ky. 2021) (internal quotation marks omitted). In pertinent part, KRS 411.137(1) provides "[a] parent who has willfully abandoned the care and maintenance of his or her child shall not have a right to maintain a wrongful death action for that child and shall not have a right otherwise to recover for the wrongful death of that child[.]" Using essentially the same language, KRS 391.033 limits a parent's "right to intestate succession" and "right to administer the estate of the child[.]" Both statutes contain two identical exceptions to the limitations of rights of the abandoning parent, neither of which are applicable under the facts presented.

While Mandy Jo's Law plainly precludes a parent from recovery if the parent willfully abandons his or her child, the statutes do not include a meaningful definition of abandonment. However, abandonment has been

14

defined as "neglect and refusal to perform natural and legal obligations to care and support, withholding of parental care, presence, opportunity to display voluntary affection and neglect to lend support and maintenance[.]" *Simms*, 615 S.W.3d at 24 (quoting *Kimbler v. Arms*, 102 S.W.3d 517, 525 (Ky. App. 2003)). "[G]enerally, abandonment is demonstrated by facts or circumstances that evince a settled purpose to forego all parental duties and relinquish all parental claims to the child." *Kimbler*, 102 S.W.3d at 523 (quoting *J.H. v. Cabinet for Hum. Res.*, 704 S.W.2d 661, 663 (Ky. App. 1985)). Thus, abandonment does not concern an issue of law but rather represents a factual issue.

This case presents a matter of first impression in the Commonwealth— whether abandonment for purposes of Mandy Jo's Law can apply to a child before birth. Contrary to the determination of the majority, I believe it can.

At the turn of the twentieth century, a mother and her unborn child were considered "but one person" at common law, which thus prevented recovery in tort for injuries to the unborn child. *See* Gregory J. Roden, *Prenatal Tort Law and the Personhood of the Unborn Child: A Separate Legal Existence*, 16 St. Thomas L. Rev. 207, 212 (2003). Kentucky joined a growing number of states in rejecting the common law rule in 1955.

> The most cogent reason, we believe, for holding that a viable unborn child is an entity within the meaning of the general word "person" is because, biologically speaking, such a child is, in fact, a presently existing person, a living human being. It should be pointed out that there is a definite medical distinction between the term "embryo" and the phrase "viable fetus." The embryo is the fetus in its earliest stages of development, but the expression

15

> "viable fetus" means the child has reached such a state of development that it can presently live outside the female body as well as within it. A fetus generally becomes a viable child between the sixth and seventh month of its existence, although there are instances of younger infants being born and surviving.

*Mitchell v. Couch*, 285 S.W.2d 901, 905 (Ky. 1955) (citing William J. Cason, *May Parents Maintain an Action for the Wrongful Death of an Unborn Child in Missouri? The Case for the Right of Action*, 15 Mo. L. Rev. 211, 218 (June 1950)); s*ee also Rice v. Rizk*, Ky., 453 S.W.2d 732, 735 (1970) (holding viable fetus is "person" for purposes of wrongful death actions under KRS 411.130). "Once the stage of viability is reached the fetus is regarded as a legal 'person' with a separate existence of its own. It is the living child of its mother and father—it has a family and resides wherever its mother resides." *Orange v. State Farm Mut. Auto. Ins. Co.*, 443 S.W.2d 650, 651 (Ky. 1969), *overruled on other grounds by Bishop v. Allstate Ins. Co.,* 623 S.W.2d 865 (Ky. 1981). Moreover, in a criminal context, this Court has held

> [i]t is inherently illogical to recognize a viable fetus as a human being whose estate can sue for wrongful death and who cannot be consensually aborted except to preserve the life or health of the mother, but not as a human being whose life can be nonconsensually terminated without criminal consequences.

*Commonwealth v. Morris*, 142 S.W.3d 654, 660 (Ky. 2004).

Additionally, putting aside any reasoned medical or scientific considerations or any developing constitutional challenges, a number of statutes enacted more recently by the General Assembly remove any doubt regarding its intent that personhood be legally understood to begin at conception. Among these are KRS 507A.010(1)(c), effective February 20, 2004,

16

which defines "Unborn child" as "a member of the species homo sapiens in utero from conception onward, without regard to age, health, or condition of dependency"; KRS 311.781(9), effective January 9, 2017, which defines "Unborn child" to mean "an individual organism of the species homo sapiens from fertilization until live birth"; and KRS 311.772(1)(c), effective June 27, 2019, which defines "Unborn human being" as "an individual living member of the species homo sapiens throughout the entire embryonic and fetal stages of the unborn child from fertilization to full gestation and childbirth."

Although no Kentucky court has directly discussed prenatal abandonment, the theory is not a new one. It has been analyzed in numerous sister jurisdictions since as early as 1974. *See Elliot v. Maddox,* 510 S.W.2d 105 (Tex. Civ. App. 1974). Although the *Elliot* court concluded the father's conduct in that case "assuredly could not have been an act of abandonment of anyone then not yet born[,]" *id.* at 107, the following year the Texas legislature enacted a statute defining prenatal abandonment. Tex. Fam. Code Ann. §161.001 (West, 2022). Other jurisdictions soon followed, and by 2017, thirty-four states had adopted prenatal abandonment laws. *See* Mary M. Beck, *Prenatal Abandonment: "Horton Hatches the Egg" in the Supreme Court and Thirty-Four States,* 24 Mich. J. Gender & L. 53 (2017). Notably, in 2018, Kentucky's General Assembly added prenatal abandonment by a putative father as a reason for granting an adoption without parental consent. KRS 199.502(j)(3).

In *Adoptive Couple v. Baby Girl*, 570 U.S. 637 (2013), the United States Supreme Court acknowledged a father could abandon a fetus by failing to provide any prenatal support and, at least tacitly, endorsed the theory of prenatal abandonment. The Supreme Court considered all of the facts which had any potential bearing upon the father's intentions to either assume or abandon parental responsibilities for the fetus; both prenatal and postnatal actions played into the calculus. In so doing, the Supreme Court concluded the father's prenatal abandonment was sufficient to overcome even the extra protections reserved by Congress for the special class of Native American fathers under the Indian Child Welfare Act of 1978, 25 U.S.C.A. § 1901 et seq., to which the subject father belonged. If prenatal abandonment can eliminate the heightened protections provided by Congress for Native American children, it logically follows that it should also operate to block fathers such as Miller who lack such elevated protections.

The assumption of duties owed a child includes contributing to the support of the mother during the pregnancy and contributing to the support of the child after its birth. Here, the child, a viable fetus, did not survive the birth, but expenses were still incurred including the cost of medical procedures and those for her funeral. Parental duties and obligations do not derive their life from court orders but are birthed from the natural relationship of biological parent and child. Contributing toward prenatal support over a typical nine-month gestational period provides fathers the opportunity to establish their parental rights.

18

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship . . . . If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie.

*Lehr v. Robertson*, 463 U.S. 248, 262 (1983).

Based on the foregoing authorities, and because pre-birth conduct may evince material facts bearing on abandonment, Kentucky courts should join the growing number of jurisdictions who have concluded the failure of a father to assume parental responsibilities, even when the child is *en ventre sa mere*,[21] can constitute abandonment. Thus, in my view, the provisions of Mandy Jo's Law may be asserted against this father who allegedly willfully abandoned the mother carrying their viable fetus prior to the child's birth.

Because this matter was tried before the court without a jury, the trial court's factual findings "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." CR[22] 52.01. Further, "the trial court, as the finder of fact, has the responsibility to judge the credibility of all testimony, and may choose to believe or disbelieve any part of the evidence presented to it." *Cabinet for Health & Fam. Servs. v. P.W.*, 582 S.W.3d 887, 896 (Ky. 2019) (citing *Caudill v. Maloney's Disc. Stores*, 560 S.W.2d 15, 16 (Ky. 1977)). If a

---

[21] This Latin phrase translates to "In its mother's womb."

[22] Kentucky Rules of Civil Procedure.

19

trial court's findings of fact are supported by substantial evidence and the correct law is applied, the appellate court will not disturb the decision unless an abuse of discretion has occurred. *Cabinet for Health & Fam. Servs. v. R.S.*, 570 S.W.3d 538, 546 (Ky. 2018). Substantial evidence is "[e]vidence that a reasonable mind would accept as adequate to support a conclusion." *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)).

"When the decision of the fact-finder favors the person with the burden of proof, his only burden on appeal is to show that there was some evidence of substance to support the finding, meaning evidence which would permit a fact-finder to reasonably find as it did." *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986). The burden of proof is on the proponent of application of Mandy Jo's Law; here, that was Bunch. In *Simms*, we held trial courts are to use a preponderance of the evidence standard when considering claims under Mandy Jo's Law. 615 S.W.3d at 23. Under that standard, the party who, on the whole, has the stronger evidence, however slight the advantage may be, must prevail. Thus, Bunch was required to present sufficient evidence to establish it was "more likely than not" that Miller abandoned Autumn. My review of the record reveals she did so.

The trial court heard live testimony from Bunch and Miller regarding events which occurred before, during, and after the pregnancy. It also had the benefit of the parties' depositions which included more details of these events. Although conflicting testimony was presented at the hearing regarding the events, the trial court has discretion on what evidence to believe or disbelieve, and apparently it determined Bunch was more credible. Trial courts are given broad discretion to make factual findings. If the testimony before the trial court is conflicting, as here, we are not at liberty to substitute our decision in place of the judgment made by the trial court. *R.C.R. v. Commonwealth Cabinet for Hum. Res.*, 988 S.W.2d 36 (Ky. App. 1998). The test is whether the trial court's rulings were clearly erroneous or constituted an abuse of discretion and not whether we, as an appellate court, would have decided the matter differently. *Cherry v. Cherry*, 634 S.W.2d 423, 425 (Ky. 1982).

I have reviewed the record and—although neither of the litigants arguably come to this case with clean hands—I must conclude the trial court's findings of fact were supported by substantial evidence as correctly held by the Court of Appeals. Testimony adduced before the trial court revealed Miller immediately left once he learned Bunch was pregnant. It is undisputed Autumn was a viable fetus. Miller knew or had reason to believe he was Autumn's father, even testifying he thought Autumn was his "the whole time." Nevertheless, he made little to no effort to contact or support Bunch during the pregnancy. Miller did not accompany Bunch to any prenatal physician visits or lend assistance during her multiple admissions to the hospital due to

21

complications associated with the pregnancy. He sent Bunch a $25 MoneyGram one time but otherwise offered no financial support. Miller appeared only briefly at the hospital following Autumn's death and did not attend the funeral nor assist in paying for same. Moreover, he did not contribute to Autumn's grave marker.

Miller offered contradictory testimony, claiming to have accompanied Bunch to a single doctor's appointment, giving her additional monies during the pregnancy, and offering to pay for the funeral expenses. "While some of the evidence conflicted with the trial court's conclusions, and a different trial court or a reviewing appellate court might disagree with the trial court, the standard on appellate review requires a great deal of deference both to its findings of fact and discretionary decisions." *Frances v. Frances*, 266 S.W.3d 754, 758 (Ky. 2008). Sufficient evidence was adduced to make it more likely than not that Miller had "a settled purpose to forego all parental duties and relinquish all parental claims to the child." *Kimbler*, 102 S.W.3d at 523. Miller exhibited almost no feeling for the unborn child and arguably would have continued his passive stance had the present action not been filed. He clearly eschewed his prenatal responsibilities and only asserted his parental rights when it became potentially financially beneficial for him to do so. Miller plainly disagrees with the trial court's decision, but a mere disagreement with a finding is an insufficient basis for this Court to conclude the trial court erred. I cannot say the trial court abused its discretion in finding Miller abandoned Autumn and

22

was therefore precluded from sharing in the settlement proceeds resulting from her untimely passing.

For the foregoing reasons, I would affirm the decision of the Court of Appeals.

Minton, C.J. and Keller, J., join.

COUNSEL FOR APPELLANT:

Kevin Wayne Johnson
Law Office of Kevin W. Johnson

COUNSEL FOR APPELLEE:
Daniel F. Dotson
Daniel F. Dotson, PSC

Stephen M. O'Brien
O'Brien Batten & Kirtley, PLLC